(Slip Opinion) OCTOBER TERM, 2013 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HARRIS ET AL. *v.* QUINN, GOVERNOR OF ILLINOIS, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 11–681. Argued January 21, 2014—Decided June 30, 2014

Illinois' Home Services Program (Rehabilitation Program) allows Medicaid recipients who would normally need institutional care to hire a "personal assistant" (PA) to provide homecare services. Under State law, the homecare recipients (designated "customers") and the State both play some role in the employment relationship with the PAs. Customers control most aspects of the employment relationship, including the hiring, firing, training, supervising, and disciplining of PAs; they also define the PA's duties by proposing a "Service Plan." Other than compensating PAs, the State's involvement in employment matters is minimal. Its employer status was created by executive order, and later codified by the legislature, solely to permit PAs to join a labor union and engage in collective bargaining under Illinois' Public Labor Relations Act (PLRA).

Pursuant to this scheme, respondent SEIU Healthcare Illinois & Indiana (SEIU–HII) was designated the exclusive union representative for Rehabilitation Program employees. The union entered into collective-bargaining agreements with the State that contained an agency-fee provision, which requires all bargaining unit members who do not wish to join the union to pay the union a fee for the cost of certain activities, including those tied to the collective-bargaining process. A group of Rehabilitation Program PAs brought a class action against SEIU–HII and other respondents in Federal District Court, claiming that the PLRA violated the First Amendment insofar as it authorized the agency-fee provision. The District Court dismissed their claims, and the Seventh Circuit affirmed in relevant part, concluding that the PAs were state employees within the meaning of *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209.

*Held*: The First Amendment prohibits the collection of an agency fee
from Rehabilitation Program PAs who do not want to join or support
the union. Pp. 8–40.

(a) In upholding the Illinois law's constitutionality, the Seventh
Circuit relied on *Abood*, which, in turn, relied on *Railway Employes*
v. *Hanson*, 351 U. S. 225, and *Machinists* v. *Street*, 367 U. S. 740.
Unlike *Abood*, those cases involved private-sector collective-
bargaining agreements. The *Abood* Court treated the First Amend-
ment issue as largely settled by *Hanson* and *Street* and understood
those cases to have upheld agency fees based on the desirability of
"labor peace" and the problem of "'free riders[hip].'" 431 U. S., 220–
222, 224. However, "preventing nonmembers from free-riding on the
union's efforts" is a rationale "generally insufficient to overcome First
Amendment objections," *Knox* v. *Service Employees*, 567 U. S. ___,
___, and in this respect, *Abood* is "something of an anomaly," 567
U. S., at ___.

The *Abood* Court's analysis is questionable on several grounds.
The First Amendment analysis in *Hanson* was thin, and *Street* was
not a constitutional decision. And the Court fundamentally misun-
derstood *Hanson*'s narrow holding, which upheld the authorization,
not imposition, of an agency fee. The *Abood* Court also failed to ap-
preciate the distinction between core union speech in the public sec-
tor and core union speech in the private sector, as well as the concep-
tual difficulty in public-sector cases of distinguishing union
expenditures for collective bargaining from those designed for politi-
cal purposes. Nor does the *Abood* Court seem to have anticipated the
administrative problems that would result in attempting to classify
union expenditures as either chargeable or nonchargeable, see, *e.g.,*
*Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, or the practical prob-
lems that would arise from the heavy burden facing objecting non-
members wishing to challenge the union's actions. Finally, the *Abood*
Court's critical "labor peace" analysis rests on the unsupported em-
pirical assumption that exclusive representation in the public sector
depends on the right to collect an agency fee from nonmembers.
Pp. 8–20.

(b) Because of *Abood'*s questionable foundations, and because Illi-
nois' PAs are quite different from full-fledged public employees, this
Court refuses to extend *Abood* to the situation here. Pp. 20–29.

(1) PAs are much different from public employees. Unlike full-
fledged public employees, PAs are almost entirely answerable to the
customers and not to the State, do not enjoy most of the rights and
benefits that inure to state employees, and are not indemnified by the
State for claims against them arising from actions taken during the
course of their employment. Even the scope of collective bargaining

on their behalf is sharply limited. Pp. 20–25.

(2) *Abood*'s rationale is based on the assumption that the union possesses the full scope of powers and duties generally available under American labor law. Even the best argument for *Abood*'s anomalous approach is a poor fit here. What justifies the agency fee in the *Abood* context is the fact that the State compels the union to promote and protect the interests of nonmembers in "negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances." *Lehnert, supra,* at 556. That rationale has little application here, where Illinois law requires that all PAs receive the same rate of pay and the union has no authority with respect to a PA's grievances against a customer. Pp. 25–27.

(3) Extending *Abood*'s boundaries to encompass partial public employees would invite problems. State regulations and benefits affecting such employees exist along a continuum, and it is unclear at what point, short of full-fledged public employment, *Abood* should apply. Under respondents' view, a host of workers who currently receive payments from a government entity for some sort of service would become candidates for inclusion within *Abood*'s reach, and it would be hard to see where to draw the line. Pp. 27–29.

(c) Because *Abood* does not control here, generally applicable First Amendment standards apply. Thus, the agency-fee provision here must serve a "'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox, supra,* at \_\_\_. None of the interests that respondents contend are furthered by the agency-fee provision is sufficient. Pp. 29–34.

(1) Their claim that the agency-fee provision promotes "labor peace" misses the point. Petitioners do not contend that they have a First Amendment right to form a rival union or that SEIU–HII has no authority to serve as the exclusive bargaining representative. This, along with examples from some federal agencies and many state laws, demonstrates that a union's status as exclusive bargaining agent and the right to collect an agency fee from nonmembers are not inextricably linked. Features of the Illinois scheme—*e.g.,* PAs do not work together in a common state facility and the union's role is very restricted—further undermine the "labor peace" argument. Pp. 31–32.

(2) Respondents also argue that the agency-fee provision promotes the welfare of PAs, thereby contributing to the Rehabilitation Program's success. Even assuming that SEIU–HII has been an effective advocate, the agency-fee provision cannot be sustained unless the union could not adequately advocate without the receipt of non-

member agency fees.  No such showing has been made.  Pp. 32–34.

(d) Respondents' additional arguments for sustaining the Illinois scheme are unconvincing.  First, they urge the application of a balancing test derived from *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563.  This Court has never viewed *Abood* and its progeny as based on *Pickering* balancing.  And even assuming that *Pickering* applies, that case's balancing test clearly tips in favor of the objecting employees' First Amendment interests.  Second, respondents err in contending that a refusal to extend *Abood* here will call into question this Court's decisions in *Keller* v. *State Bar of Cal.*, 496 U. S. 1, and *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, for those decisions fit comfortably within the framework applied here.  Pp. 34–40.

656 F. 3d 692, reversed in part, affirmed in part, and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined.  KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–681

PAMELA HARRIS, ET AL, PETITIONERS *v.* PAT QUINN, GOVERNOR OF ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 30, 2014]

JUSTICE ALITO delivered the opinion of the Court.

This case presents the question whether the First Amendment permits a State to compel personal care providers to subsidize speech on matters of public concern by a union that they do not wish to join or support. We hold that it does not, and we therefore reverse the judgment of the Court of Appeals.

I

A

Millions of Americans, due to age, illness, or injury, are unable to live in their own homes without assistance and are unable to afford the expense of in-home care. In order to prevent these individuals from having to enter a nursing home or other facility, the federal Medicaid program funds state-run programs that provide in-home services to individuals whose conditions would otherwise require institutionalization. See 42 U. S. C. §1396n(c)(1). A State that adopts such a program receives federal funds to compensate persons who attend to the daily needs of individuals needing in-home care. *Ibid.*; see also 42 CFR §§440.180, 441.300–441.310 (2013). Almost every State has established such a program. See Dept. of Health and

Human Services, Understanding Medicaid Home and Community Services: A Primer (2010).

One of those States is Illinois, which has created the Illinois Department of Human Services Home Services Program, known colloquially as the state "Rehabilitation Program." Ill. Comp. Stat., ch. 20, §2405/3(f) (West 2012); 89 Ill. Admin. Code §676.10 (2007). "[D]esigned to prevent the unnecessary institutionalization of individuals who may instead be satisfactorily maintained at home at a lesser cost to the State," §676.10(a), the Rehabilitation Program allows participants to hire a "personal assistant" who provides homecare services tailored to the individual's needs. Many of these personal assistants are relatives of the person receiving care, and some of them provide care in their own homes. See App. 16–18.

Illinois law establishes an employer-employee relationship between the person receiving the care and the person providing it. The law states explicitly that the person receiving home care—the "customer"—"shall be *the* employer of the [personal assistant]." 89 Ill. Admin. Code §676.30(b) (emphasis added). A "personal assistant" is defined as "an individual employed *by the customer* to provide . . . varied services that have been approved by the customer's physician," §676.30(p) (emphasis added), and the law makes clear that Illinois "shall not have control or input in the employment relationship between the customer and the personal assistants." §676.10(c).

Other provisions of the law emphasize the customer's employer status. The customer "is responsible for controlling all aspects of the employment relationship between the customer and the [personal assistant (or PA)], including, without limitation, locating and hiring the PA, training the PA, directing, evaluating and otherwise supervising the work performed by the personal assistant, imposing . . . disciplinary action against the PA, and terminating the employment relationship between the cus-

tomer and the PA." §676.30(b).[1]  In general, the customer "has complete discretion in which Personal Assistant he/she wishes to hire." §684.20(b).

A customer also controls the contents of the document, the Service Plan, that lists the services that the customer will receive. §684.10(a).  No Service Plan may take effect without the approval of both the customer and the customer's physician.  See §684.10, 684.40, 684.50, 684.75. Service Plans are highly individualized.  The Illinois State Labor Relations Board noted in 1985 that "[t]here is no typical employment arrangement here, public or otherwise; rather, there simply exists an arrangement whereby the state of Illinois pays individuals . . . to work under the direction and control of private third parties." *Illinois Dept. of Central Management Serv.*, No. S–RC–115, 2 PERI ¶2007, p. VIII–30, (1985), superseded, 2003 Ill. Laws p. 1929.

While customers exercise predominant control over their employment relationship with personal assistants, the State, subsidized by the federal Medicaid program, pays the personal assistants' salaries.  The amount paid varies depending on the services provided, but as a general matter, it "corresponds to the amount the State would expect to pay for the nursing care component of institutionalization if the individual chose institutionalization."  89 Ill. Admin. Code §679.50(a).

––––––––

[1] Although this regulation states clearly that a customer has complete discretion with respect to hiring and firing a personal assistant, the dissent contends that the State also has the authority to end the employment of a personal assistant whose performance is not satisfactory.  Nothing in the regulations supports this view.  Under 89 Ill. Admin. Code §677.40(d), the State may stop paying a personal assistant if it is found that the assistant does not meet "the standards established by DHS as found at 89 Ill. Adm. Code 686."  These standards are the basic hiring requirements set out in §686.10, see n. 2, *infra*.  Providing adequate performance after hiring is nowhere mentioned in §686.10.

Other than providing compensation, the State's role is comparatively small. The State sets some basic threshold qualifications for employment. See §§686.10(h)(1)–(10).[2] (For example, a personal assistant must have a Social Security number, must possess basic communication skills, and must complete an employment agreement with the customer. §§686.10, 686.20, 686.40.) The State mandates an annual performance review *by the customer, helps the customer* conduct that review, and mediates disagreements between customers and their personal assistants. §686.30. The State *suggests* certain duties that personal assistants should assume, such as performing "household tasks," "shopping," providing "personal care," performing "incidental health care tasks," and "monitoring to ensure the health and safety of the customer." §686.20. In addition, a state employee must "identify the appropriate level of service provider" "*based on the customer's approval* of the initial Service Plan," §684.20(a) (emphasis added), and must sign each customer's Service Plan. §684.10.

B

Section 6 of the Illinois Public Labor Relations Act (PLRA) authorizes state employees to join labor unions and to bargain collectively on the terms and conditions of

————————

[2] It is true, as the dissent notes, *post,* at 4, that a personal assistant must provide two written or oral references, see §686.10(c), but judging the adequacy of these references is the sole prerogative of the customer. See §676.30(b). And while the regulations say that an applicant must have either previous experience or training, see §686.10(f), they also provide that a customer has complete discretion to judge the adequacy of training and prior experience. See §684.20(b) (the customer has complete discretion with respect to hiring and training a personal assistant). See also §686.10(b) (the customer may hire a minor—even under some circumstances, a person as young as 14); §686.10(f) (the customer may hire a personal assistant who was never previously employed so long as the assistant has adequate training); §684.20(b) (criminal record check not required).

employment. Ill. Comp. Stat., ch. 5, §315/6(a). This law applies to "[e]mployees of the State and any political subdivision of the State," subject to certain exceptions, and it provides for a union to be recognized if it is "designated by the [Public Labor Relations] Board as the representative of the majority of public employees in an appropriate unit . . . ." §§315/6(a), (c).

The PLRA contains an agency-fee provision, *i.e.*, a provision under which members of a bargaining unit who do not wish to join the union are nevertheless required to pay a fee to the union. See *Workers* v. *Mobil Oil Corp.*, 426 U. S. 407, 409, n. 1 (1976). Labeled a "fair share" provision, this section of the PLRA provides: "When a collective bargaining agreement is entered into with an exclusive representative, it may include in the agreement a provision requiring employees covered by the agreement who are not members of the organization to pay their proportionate share of the costs of the collective-bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment." §315/6(e). This payment is "deducted by the employer from the earnings of the nonmember employees and paid to the employee organization." *Ibid.*

In the 1980's, the Service Employees International Union (SEIU) petitioned the Illinois Labor Relations Board for permission to represent personal assistants employed by customers in the Rehabilitation Program, but the board rebuffed this effort. *Illinois Dept. of Central Management Servs.*, *supra*, at VIII–30. The board concluded that "it is clear . . . that [Illinois] does not exercise the type of control over the petitioned-for employees necessary to be considered, in the collective bargaining context envisioned by the [PLRA], their 'employer' or, at least, their sole employer." *Ibid.*

In March 2003, however, Illinois' newly elected Governor, Rod Blagojevich, circumvented this decision by issu-

ing Executive Order 2003–08. See App. to Pet. for Cert.
45a–47a. The order noted the Illinois Labor Relations
Board decision but nevertheless called for state recogni-
tion of a union as the personal assistants' exclusive repre-
sentative for the purpose of collective bargaining with the
State. This was necessary, Gov. Blagojevich declared, so
that the State could "receive feedback from the personal
assistants in order to effectively and efficiently deliver
home services." *Id.*, at 46a. Without such representation,
the Governor proclaimed, personal assistants "cannot
effectively voice their concerns about the organization of
the Home Services program, their role in the program, or
the terms and conditions of their employment under the
Program." *Ibid.*

Several months later, the Illinois Legislature codified
that executive order by amending the PLRA. Pub. Act no.
93–204, §5, 2003 Ill. Laws p. 1930. While acknowledging
"the right of the persons receiving services . . . to hire and
fire personal assistants or supervise them," the Act de-
clared personal assistants to be "public employees" of the
State of Illinois—but "[s]olely for the purposes of coverage
under the Illinois Public Labor Relations Act." Ill. Comp.
Stat., ch. 20, §2405/3(f). The statute emphasized that
personal assistants are not state employees for any other
purpose, "including but not limited to, purposes of vicari-
ous liability in tort and purposes of statutory retirement
or health insurance benefits." *Ibid.*

Following a vote, SEIU Healthcare Illinois & Indiana
(SEIU–HII) was designated as the personal assistants'
exclusive representative for purposes of collective bargain-
ing. See App. 23. The union and the State subsequently
entered into collective-bargaining agreements that require
all personal assistants who are not union members to pay
a "fair share" of the union dues. *Id.*, at 24–25. These
payments are deducted directly from the personal assis-
tants' Medicaid payments. *Ibid.* The record in this case

shows that each year, personal assistants in Illinois pay SEIU–HII more than $3.6 million in fees. *Id.,* at 25.

## C

Three of the petitioners in the case now before us— Theresa Riffey, Susan Watts, and Stephanie Yencer-Price—are personal assistants under the Rehabilitation Program. They all provide in-home services to family members or other individuals suffering from disabilities.[3] Susan Watts, for example, serves as personal assistant for her daughter, who requires constant care due to quadriplegic cerebral palsy and other conditions. See App. 18.

In 2010, these petitioners filed a putative class action on behalf of all Rehabilitation Program personal assistants in the United States District Court for the Northern District of Illinois. See 656 F. 3d 692, 696 (CA7 2011). Their complaint, which named the Governor and the union as defendants, sought an injunction against enforcement of the fair-share provision and a declaration that the Illinois PLRA violates the First Amendment insofar as it requires personal assistants to pay a fee to a union that they do not wish to support. *Ibid.*

The District Court dismissed their claims with prejudice, and the Seventh Circuit affirmed in relevant part, concluding that the case was controlled by this Court's decision in *Abood* v. *Detroit Bd. of Ed.* 431 U. S. 209 (1977). 656 F. 3d, at 698. The Seventh Circuit held that Illinois and the customers who receive in-home care are "joint employers" of the personal assistants, and the court stated that it had "no difficulty concluding that the State employs personal assistants within the meaning of *Abood.*" *Ibid.*

Petitioners sought certiorari. Their petition pointed out

––––––––

[3] The other five petitioners are personal assistants under a similar Illinois program called the "Disabilities Program." See, *infra,* at 39–40, and n. 30.

that other States were following Illinois' lead by enacting
laws or issuing executive orders that deem personal assis-
tants to be state employees for the purpose of unionization
and the assessment of fair-share fees.  See App. to Pet. for
Cert. 22a.  Petitioners also noted that Illinois has enacted
a law that deems "individual maintenance home health
workers"—a category that includes registered nurses,
licensed practical nurses, and certain therapists who work
in private homes—to be "public employees" for similar
purposes.  Ill. Pub. Act no. 97–1158, 2012 Ill. Laws p.
7823.

In light of the important First Amendment questions
these laws raise, we granted certiorari.  570 U. S. \_\_\_
(2013).

## II

In upholding the constitutionality of the Illinois law, the
Seventh Circuit relied on this Court's decision in *Abood
supra*, which held that state employees who choose not to
join a public-sector union may nevertheless be compelled
to pay an agency fee to support union work that is related
to the collective-bargaining process.  *Id.*, at 235–236.  Two
Terms ago, in *Knox* v. *Service Employees*, 567 U. S. \_\_\_
(2012), we pointed out that *Abood* is "something of an
anomaly."  *Id.,* at \_\_\_ (slip op., at 11).  "'The primary
purpose' of permitting unions to collect fees from non-
members," we noted, "is 'to prevent nonmembers from
free-riding on the union's efforts, sharing the employment
benefits obtained by the union's collective bargaining
without sharing the costs incurred.'"  *Id.,* at \_\_\_ (slip op.,
at 10) (quoting *Davenport* v. *Washington Ed. Assn.*, 551
U. S. 177, 181 (2007)).  But "[s]uch free-rider arguments
. . . are generally insufficient to overcome First Amend-
ment objections."  567 U. S., at \_\_\_ (slip op., at 10–11).

For this reason, *Abood* stands out, but the State of
Illinois now asks us to sanction what amounts to a very

significant expansion of *Abood*—so that it applies, not just to full-fledged public employees, but also to others who are deemed to be public employees solely for the purpose of unionization and the collection of an agency fee. Faced with this argument, we begin by examining the path that led to this Court's decision in *Abood*.

A

The starting point was *Railway Employes* v. *Hanson*, 351 U. S. 225 (1956), a case in which the First Amendment was barely mentioned. The dispute in *Hanson* resulted from an amendment to the Railway Labor Act (RLA). *Id.*, at 229, 232. As originally enacted in 1926, the Act did not permit a collective-bargaining agreement to require employees to join or make any payments to a union. See *Machinists* v. *Street*, 367 U. S. 740, 750 (1961). At that time and for many years thereafter, there was "a strong and long-standing tradition of voluntary unionism on the part of the standard rail unions." *Ibid.*

Eventually, however, the view of the unions changed. See *id.*, at 760–761. The RLA's framework for resolving labor disputes "is more complex than that of any other industry," *id.*, at 755, and amendments enacted in 1934 increased the financial burden on unions by creating the 36-member National Railroad Adjustment Board, one-half of whose members were appointed and paid by the unions. *Id.*, at 759–760. In seeking authorization to enter into union-shop agreements, *i.e.*, agreements requiring all employees to join a union and thus pay union dues, see *Oil Workers*, 426 U. S., at 409, n. 1, the unions' principal argument "was based on their role in this regulatory framework." *Street*, 367 U. S., at 761. A union spokesman argued that the financial burdens resulting from the Act's unique and complex scheme justified union-shop provisions in order to provide the unions with needed dues. *Ibid.*

These arguments were successful, and the Act was amended in 1951 to *permit* a railroad and a union to enter into an agreement containing a union-shop provision. This amendment brought the Act into conflict with the laws of States that guaranteed the "right to work" and thereby outlawed the union shop. Nebraska, the setting of *Hanson*, was one such State. 351 U. S., at 228.

In *Hanson*, the Union Pacific Railroad Company and its unionized workers entered into a collective-bargaining agreement that contained a provision requiring employees, "as a condition of their continued employment," to join and remain members of the union. *Id*., at 227. Employees who did not want to join the union brought suit in state court, contending that the union-shop provision violated a provision of the Nebraska Constitution banning adverse employment actions "'because of refusal to join or affiliate with a labor organization.'" *Id*., at 228 (quoting Neb. Const., Art. XV, §13). The employer countered that the RLA trumped the Nebraska provision, but the Nebraska courts agreed with the employees and struck down the union-shop agreement.

When the case reached this Court, the primary issue was whether the provision of the RLA that authorized union-shop agreements was "germane to the exercise of power under the Commerce Clause." 351 U. S., at 234–235. In an opinion by Justice Douglas, the Court held that this provision represented a permissible regulation of commerce. The Court reasoned that the challenged provision "'stabilized labor-management relations'" and thus furthered "'industrial peace.'" *Id*., at 233–234.

The employees also raised what amounted to a facial constitutional challenge to the same provision of the RLA. The employees claimed that a "union shop agreement forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought protected by the Bill

of Rights." *Id.*, at 236. But because the lawsuit had been filed shortly after the collective-bargaining agreement was approved, the record contained no evidence that the union had actually engaged in political or ideological activities.[4]

The *Hanson* Court dismissed the objecting employees' First Amendment argument with a single sentence. The Court wrote: "On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar." *Id.*, at 238.

This explanation was remarkable for two reasons. First, the Court had never previously held that compulsory membership in and the payment of dues to an integrated bar was constitutional, and the constitutionality of such a requirement was hardly a foregone conclusion. Indeed, that issue did not reach the Court until five years later, and it produced a plurality opinion and four separate writings. See *Lathrop* v. *Donohue*, 367 U. S. 820 (1961) (plurality opinion).[5]

Second, in his *Lathrop* dissent, Justice Douglas, the author of *Hanson*, came to the conclusion that the First Amendment *did not permit* compulsory membership in an integrated bar. See 367 U. S., at 878–880. The analogy drawn in *Hanson*, he wrote, fails. "Once we approve this measure," he warned, "we sanction a device where men and women in almost any profession or calling can be at

_____

[4] The employees' First Amendment claim necessarily raised the question of governmental action, since the First Amendment does not restrict private conduct, and the *Hanson* Court, in a brief passage, concluded that governmental action was present. This was so, the Court reasoned, because the union-shop provision of the RLA took away a right that employees had previously enjoyed under state law. 351 U. S., at 232–233.

[5] A related question arose in *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990), which we discuss *infra*, at 37–38.

least partially regimented behind causes which they op-
pose." 367 U. S., at 884.  He continued:

> "I look on the *Hanson* case as a narrow exception to be
> closely confined.  Unless we so treat it, we practically
> give *carte blanche* to any legislature to put at least
> professional people into goose-stepping brigades.
> Those brigades are not compatible with the First
> Amendment." *Id.*, at 884–885 (footnote omitted).

The First Amendment analysis in *Hanson* was thin, and
the Court's resulting First Amendment holding was nar-
row.  As the Court later noted, "all that was held in *Han-
son* was that [the RLA] was constitutional in its *bare
authorization* of union-shop contracts requiring workers to
give 'financial support' to unions legally authorized to act
as their collective bargaining agents." *Street*, 367 U. S., at
749 (emphasis added).  The Court did not suggest that
"industrial peace" could justify a law that "forces men into
ideological and political associations which violate their
right to freedom of conscience, freedom of association, and
freedom of thought," or a law that forces a person to "con-
form to [a union's] ideology." *Hanson, supra,* at 236–237.
The RLA did not compel such results, and the record in
*Hanson* did not show that this had occurred.

B

Five years later, in *Street*, *supra*, the Court considered
another case in which workers objected to a union shop.
Employees of the Southern Railway System raised a First
Amendment challenge, contending that a substantial part
of the money that they were required to pay to the union
was used to support political candidates and causes with
which they disagreed.  A Georgia court enjoined the en-
forcement of the union-shop provision and entered judg-
ment for the dissenting employees in the amount of the
payments that they had been forced to make to the union.

The Georgia Supreme Court affirmed. *Id.*, at 742–745.

Reviewing the State Supreme Court's decision, this Court recognized that the case presented constitutional questions "of the utmost gravity," *id.*, at 749, but the Court found it unnecessary to reach those questions. Instead, the Court construed the RLA "as not vesting the unions with unlimited power to spend exacted money." *Id.*, at 768. Specifically, the Court held, the Act "is to be construed to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." *Id.*, at 768–769.

Having construed the RLA to contain this restriction, the *Street* Court then went on to discuss the remedies available for employees who objected to the use of union funds for political causes. The Court suggested two: The dissenting employees could be given a refund of the portion of their dues spent by the union for political or ideological purposes, or they could be given a refund of the portion spent on those political purposes that they had advised the union they disapproved.[6] *Id.*, at 774–775.

Justice Black, writing in dissent, objected to the Court's suggested remedies, and he accurately predicted that the Court's approach would lead to serious practical problems. *Id.*, at 796–797. That approach, he wrote, while "very lucrative to special masters, accountants and lawyers," would do little for "the individual workers whose First Amendment freedoms have been flagrantly violated." *Id.,* at 796. He concluded:

> "Unions composed of a voluntary membership, like all other voluntary groups, should be free in this country to fight in the public forum to advance their own

_____

[6] Only four Justices fully agreed with this approach, but a fifth, Justice Douglas, went along due to "the practical problem of mustering five Justices for a judgment in this case." *Id.*, at 778–779 (concurring opinion).

causes, to promote their choice of candidates and parties and to work for the doctrines or the laws they favor.  But to the extent that Government steps in to force people to help espouse the particular causes of a group, that group—whether composed of railroad workers or lawyers—loses its status as a voluntary group." *Ibid.*

Justice Frankfurter, joined by Justice Harlan, also dissented, arguing that the Court's remedy was conceptually flawed because a union may further the objectives of members by political means.  See *id.*, at 813–815.  He noted, for example, that reports from the AFL–CIO Executive Council "emphasize that labor's participation in urging legislation and candidacies is a major one."  *Id.*, at 813.  In light of "the detailed list of national and international problems on which the AFL–CIO speaks," he opined, "it seems rather naive" to believe "that economic and political concerns are separable."  *Id.*, at 814.

C

This brings us to *Abood*, which, unlike *Hanson* and *Street*, involved a public-sector collective-bargaining agreement.  The Detroit Federation of Teachers served "as the exclusive representative of teachers employed by the Detroit Board of Education."  431 U. S., at 211–212.  The collective-bargaining agreement between the union and the board contained an agency-shop clause requiring every teacher to "pay the Union a service charge equal to the regular dues required of Union members."  *Id.*, at 212.  A putative class of teachers sued to invalidate this clause.  Asserting that "they opposed collective bargaining in the public sector," the plaintiffs argued that "'a substantial part'" of their dues would be used to fund union "'activities and programs which are economic, political, professional, scientific and religious in nature of which Plaintiffs do not approve, and in which they will have no voice.'"

*Id*., at 212–213.

This Court treated the First Amendment issue as largely settled by *Hanson* and *Street*. 431 U. S., at 217, 223. The Court acknowledged that *Street* was resolved as a matter of statutory construction without reaching any constitutional issues, 431 U. S., at 220, and the Court recognized that forced membership and forced contributions impinge on free speech and associational rights, *id*., at 223. But the Court dismissed the objecting teachers' constitutional arguments with this observation: "[T]he judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Id.,* at 222.

The *Abood* Court understood *Hanson* and *Street* to have upheld union-shop agreements in the private sector based on two primary considerations: the desirability of "labor peace" and the problem of "'free riders[hip].'" 431 U. S., at 220–222, 224.

The Court thought that agency-shop provisions promote labor peace because the Court saw a close link between such provisions and the "principle of exclusive union representation." *Id*., at 220. This principle, the Court explained, "prevents inter-union rivalries from creating dissension within the work force and eliminating the advantages to the employee of collectivization." *Id*., at 220–221. In addition, the Court noted, the "designation of a single representative avoids the confusion that would result from attempting to enforce two or more agreements specifying different terms and conditions of employment." *Id*., at 220. And the Court pointed out that exclusive representation "frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from

rival labor organizations." *Id*., at 221.

Turning to the problem of free ridership, *Abood* noted that a union must "'fairly and equitably . . . represent all employees'" regardless of union membership, and the Court wrote as follows: The "union-shop arrangement has been thought to distribute fairly the cost of these activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become 'free riders' to refuse to contribute to the union while obtaining benefits of union representation." *Id*., at 221–222.

The plaintiffs in *Abood* argued that *Hanson* and *Street* should not be given much weight because they did not arise in the public sector, and the Court acknowledged that public-sector bargaining is different from private-sector bargaining in some notable respects. 431 U. S., at 227–228. For example, although public and private employers both desire to keep costs down, the Court recognized that a public employer "lacks an important discipline against agreeing to increases in labor costs that in a market system would require price increases." *Id*., at 228. The Court also noted that "decisionmaking by a public employer is above all a political process" undertaken by people "ultimately responsible to the electorate." *Ibid.* Thus, whether a public employer accedes to a union's demands, the Court wrote, "will depend upon a blend of political ingredients," thereby giving public employees "more influence in the decisionmaking process that is possessed by employees similarly organized in the private sector." *Ibid.* But despite these acknowledged differences between private- and public-sector bargaining, the Court treated *Hanson* and *Street* as essentially controlling.

Instead of drawing a line between the private and public sectors, the *Abood* Court drew a line between, on the one hand, a union's expenditures for "collective-bargaining, contract administration, and grievance-adjustment purposes," 431 U. S., at 232, and, on the other, expenditures

for political or ideological purposes. *Id.*, at 236.

## D

The *Abood* Court's analysis is questionable on several grounds. Some of these were noted or apparent at or before the time of the decision, but several have become more evident and troubling in the years since then.

The *Abood* Court seriously erred in treating *Hanson* and *Street* as having all but decided the constitutionality of compulsory payments to a public-sector union. As we have explained, *Street* was not a constitutional decision at all, and *Hanson* disposed of the critical question in a single, unsupported sentence that its author essentially abandoned a few years later. Surely a First Amendment issue of this importance deserved better treatment.

The *Abood* Court fundamentally misunderstood the holding in *Hanson*, which was really quite narrow. As the Court made clear in *Street*, "all that was held in *Hanson* was that [the RLA] was constitutional *in its bare authorization* of union-shop contracts requiring workers to give 'financial support' to unions legally authorized to act as their collective bargaining agents." 367 U. S., at 749 (emphasis added). In *Abood*, on the other hand, the State of Michigan did more than simply *authorize* the imposition of an agency fee. A state instrumentality, the Detroit Board of Education, actually *imposed* that fee. This presented a very different question.

*Abood* failed to appreciate the difference between the core union speech involuntarily subsidized by dissenting public-sector employees and the core union speech involuntarily funded by their counterparts in the private sector. In the public sector, core issues such as wages, pensions, and benefits are important political issues, but that is generally not so in the private sector. In the years since *Abood*, as state and local expenditures on employee wages and benefits have mushroomed, the importance of the

difference between bargaining in the public and private sectors has been driven home.[7]

*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends. In the private sector, the line is easier to see. Collective bargaining concerns the union's dealings with the employer; political advocacy and lobbying are directed at the government. But in the public sector, both collective-bargaining and political advocacy and lobbying are directed at the government.

*Abood* does not seem to have anticipated the magnitude of the practical administrative problems that would result in attempting to classify public-sector union expenditures as either "chargeable" (in *Abood*'s terms, expenditures for "collective-bargaining, contract administration, and grievance-adjustment purposes," *id.,* at 232) or noncharge-able (*i.e.*, expenditures for political or ideological purposes, *id.*, at 236). In the years since *Abood*, the Court has struggled repeatedly with this issue. See *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984); *Teachers* v. *Hudson*, 475 U. S. 292 (1986); *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507 (1991); *Locke* v. *Karass*, 555 U. S. 207 (2009). In *Lehnert*, the Court held that "chargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." 500 U. S., at 519. But as noted in JUSTICE SCALIA's dissent in that case, "each

–––––––––

[7] Recent experience has borne out this concern. See DiSalvo, The Trouble with Public Sector Unions, National Affairs No. 5, p. 15 (2010) ("In Illinois, for example, public-sector unions have helped create a situation in which the state's pension funds report a liability of more than $100 billion, at least 50% of it unfunded").

one of the three 'prongs' of the test involves a substantial judgment call (What is 'germane'? What is 'justified'? What is a 'significant' additional burden)." *Id.*, at 551 (opinion concurring in judgment in part and dissenting in part).

*Abood* likewise did not foresee the practical problems that would face objecting nonmembers. Employees who suspect that a union has improperly put certain expenses in the "germane" category must bear a heavy burden if they wish to challenge the union's actions. "[T]he onus is on the employees to come up with the resources to mount the legal challenge in a timely fashion," *Knox*, 567 U. S., at ___ (slip op., at 19) (citing *Lehnert*, *supra*, at 513), and litigating such cases is expensive. Because of the open-ended nature of the *Lehnert* test, classifying particular categories of expenses may not be straightforward. See *Jibson* v. *Michigan Ed. Assn.*–NEA, 30 F. 3d 723, 730 (CA6 1994)). And although *Hudson* required that a union's books be audited, auditors do not themselves review the correctness of a union's categorization. See *Knox*, *supra*, at ___ (slip op., at 18–19) (citing *Andrews* v. *Education Assn. of Cheshire*, 829 F. 2d 335, 340 (CA2 1987)). See also *American Federation of Television and Recording Artists, Portland Local*, 327 N. L. R. B. 474, 477 (1999) ("It is settled that determinations concerning whether particular expenditures are chargeable are legal determinations which are outside the expertise of the auditor. Thus, as we have stated, the function of the auditor is to verify that the expenditures that the union claims it made were in fact made for the purposes claimed, not to pass on the correctness of the union's allocation of expenditures to the chargeable and nonchargeable categories"); *California Saw and Knife Works*, 320 N. L. R. B. 224, 241 (1995) ("We first agree [that the company at issue] did not violate its duty of fair representation by failing to use an independent auditor to determine the allocation of chargeable and

nonchargeable expenditures”); *Price* v. *International Union, United Auto, Aerospace & Agricultural Implement Workers of Am.*, 927 F. 2d 88, 93–94 (CA2 1991) (“*Hudson* requires only that the usual function of an auditor be performed, *i.e.,* to determine that the expenses claimed were in fact made. That function does not require that the auditor make a legal decision as to the appropriateness of the allocation of expenses to the chargeable and non-chargeable categories”).

Finally, a critical pillar of the *Abood* Court’s analysis rests on an unsupported empirical assumption, namely, that the principle of exclusive representation in the public sector is dependent on a union or agency shop. As we will explain, see *infra*, at 31–34, this assumption is unwarranted.

## III

### A

Despite all this, the State of Illinois now asks us to approve a very substantial expansion of *Abood’s* reach. *Abood* involved full-fledged public employees, but in this case, the status of the personal assistants is much different. The Illinois Legislature has taken pains to specify that personal assistants are public employees for one purpose only: collective bargaining. For all other purposes, Illinois regards the personal assistants as private-sector employees. This approach has important practical consequences.

For one thing, the State’s authority with respect to these two groups is vastly different. In the case of full-fledged public employees, the State establishes all of the duties imposed on each employee, as well as all of the qualifications needed for each position. The State vets applicants and chooses the employees to be hired. The State provides or arranges for whatever training is needed, and it supervises and evaluates the employees’ job performance and

imposes corrective measures if appropriate. If a state employee's performance is deficient, the State may discharge the employee in accordance with whatever procedures are required by law.

With respect to the personal assistants involved in this case, the picture is entirely changed. The job duties of personal assistants are specified in their individualized Service Plans, which must be approved by the customer and the customer's physician. 89 Ill. Admin. Code §684.10. Customers have complete discretion to hire any personal assistant who meets the meager basic qualifications that the State prescribes in §686.10. See §676.30(b) (the customer "is responsible for controlling all aspects of the employment relationship between the customer and the [personal assistant], including, *without limitation*, locating and hiring the [personal assistant]" (emphasis added)); §684.20(b) ("complete discretion in which Personal Assistant [the customer] wishes to hire" subject to baseline eligibility requirements).

Customers supervise their personal assistants on a daily basis, and no provision of the Illinois statute or implementing regulations gives the State the right to enter the home in which the personal assistant is employed for the purpose of checking on the personal assistant's job performance. Cf. §676.20(b) (customer controls "without limitation . . . supervising the work performed by the [personal assistant], imposing . . . disciplinary action against the [personal assistant]"). And while state law mandates an annual review of each personal assistant's work, that evaluation is also controlled by the customer. §§686.10(k), 686.30. A state counselor is assigned to assist the customer in performing the review but has no power to override the customer's evaluation. See *ibid.* Nor do the regulations empower the State to discharge a personal assistant for substandard performance. See n. 1, *supra.* Discharge, like hiring, is entirely in the hands of the cus-

tomer. See §676.30.

Consistent with this scheme, under which personal assistants are almost entirely answerable to the customers and not to the State, Illinois withholds from personal assistants most of the rights and benefits enjoyed by full-fledged state employees. As we have noted already, state law explicitly excludes personal assistants from statutory retirement and health insurance benefits. Ill. Comp. Stat., ch. 20, §2405/3(f). It also excludes personal assistants from group life insurance and certain other employee benefits provided under the State Employees Group Insurance Act of 1971. *Ibid.* ("Personal assistants shall not be covered by the State Employees Group Insurance Act of 1971"). And the State "does not provide paid vacation, holiday, or sick leave" to personal assistants. 89 Ill. Admin. Code §686.10(h)(7).

Personal assistants also appear to be ineligible for a host of benefits under a variety of other state laws, including the State Employee Vacation Time Act (see Ill. Stat., ch. 5, §360/1); the State Employee Health Savings Account Law (see Ill. Stat., ch. 5, §377/10–1); the State Employee Job Sharing Act (see Ill. Stat., ch. 5, §380/0.01); the State Employee Indemnification Act (see Ill. Stat., ch. 5, §350/2); and the Sick Leave Bank Act. See Ill. Stat., ch. 5, §400/1. Personal assistants are apparently not entitled to the protection that the Illinois Whistleblower Act provides for full-fledged state employees. See Ill. Stat., ch. 740, §174/1. And it likewise appears that personal assistants are shut out of many other state employee programs and benefits. The Illinois Department of Central Management Services lists many such programs and benefits, including a deferred compensation program, full worker's compensation privileges,[8] behavioral health programs, a program that

———————

[8] Under §686.10(h)(9), a personal assistant "may apply for Workers' Compensation benefits through [the State] . . . however, . . . the cus-

allows state employees to retain health insurance for a time after leaving state employment, a commuter savings program, dental and vision programs, and a flexible spending program.[9]  All of these programs and benefits appear to fall within the provision of the Rehabilitation Program declaring that personal assistants are not state employees for "any purposes" other than collective bargaining.  See Ill. Comp. Stat., ch. 20, §2405/3(f ).

Just as the State denies personal assistants most of the rights and benefits enjoyed by full-fledged state workers, the State does not assume responsibility for actions taken by personal assistants during the course of their employment.  The governing statute explicitly disclaims "vicarious liability in tort."  *Ibid.*  So if a personal assistant steals from a customer, neglects a customer, or abuses a customer, the State washes its hands.

Illinois deems personal assistants to be state employees for one purpose only, collective bargaining,[10] but the scope of bargaining that may be conducted on their behalf is sharply limited.  Under the governing Illinois statute, collective bargaining can occur only for "terms and conditions of employment that are within the State's control." Ill. Comp. Stat., ch. 20, §2405/3(f).  That is not very much.

As an illustration, consider the subjects of mandatory bargaining under federal and state labor law that are out

—————————

tomer, not DHS, is the employer for these purposes."

[9] See  www2.illinois.gov/cms/Employees/benefits/StateEmployee/Pages/default.

[10] What is significant is not the label that the State assigns to the personal assistants but the substance of their relationship to the customers and the State.  Our decision rests in no way on state-law labels.  Cf. *post*, at 10.  Indeed, it is because the First Amendment's meaning does not turn on state-law labels that we refuse to allow the state to make a nonemployee a full-fledged employee "[s]olely for purposes of coverage under the Illinois Public Labor Relations Act," Ill. Comp. Stat., ch. 20, §2405/3(f), through the use of a statutory label.

of bounds when it comes to personal assistants. Under federal law, mandatory subjects include the days of the week and the hours of the day during which an employee must work,[11] lunch breaks,[12] holidays,[13] vacations,[14] termination of employment,[15] and changes in job duties.[16] Illinois law similarly makes subject to mandatory collective-bargaining decisions concerning the "hours and terms and conditions of employment." *Belvidere* v. *Illinois State Labor Relations Bd.*, 181 Ill. 2d 191, 201, 692 N. E. 2d 295, 301 (1998); see also, *e.g., Aurora Sergeants Assn.*, 24 PERI ¶25 (2008) (holding that days of the week worked by police officers is subject to mandatory collective bargaining). But under the Rehabilitation Program, all these topics are governed by the Service Plan, with respect to which the union has no role. See §676.30(b) (the customer "is responsible for controlling all aspects of the employment relationship between the customer and the PA, including, without limitation, locating and hiring the PA, training the PA, directing, evaluating, and otherwise supervising the work performed by the PA, imposing . . . disciplinary action against the PA, and terminating the employment relationship between the customer and the PA"); §684.50 (the Service Plan must specify "the frequency with which the specific tasks are to be provided" and "the number of hours each task is to be provided per month").

## B

### 1

The unusual status of personal assistants has important

---

[11] See *Meat Cutters* v. *Jewel Tea Co.*, 381 U. S. 676 (1965).

[12] See *In re National Grinding Wheel Co.*, 75 N. L. R. B. 905 (1948).

[13] See *In re Singer Manufacturing Co.*, 24 N. L. R. B. 444 (1940).

[14] See *Great Southern Trucking Co.* v. *NLRB*, 127 F. 2d 180 (CA4 1942).

[15] See *N. K. Parker Transport, Inc.*, 332 N. L. R. B. 547, 551 (2000).

[16] See *St. John's Hospital*, 281 N. L. R. B. 1163, 1168 (1986).

implications for present purposes. *Abood*'s rationale, whatever its strengths and weaknesses, is based on the assumption that the union possesses the full scope of powers and duties generally available under American labor law. Under the Illinois scheme now before us, however, the union's powers and duties are sharply circumscribed, and as a result, even the best argument for the "extraordinary power" that *Abood* allows a union to wield, see *Davenport,* 551 U. S., at 184, is a poor fit.

In our post-*Abood* cases involving public-sector agency-fee issues, *Abood* has been a given, and our task has been to attempt to understand its rationale and to apply it in a way that is consistent with that rationale. In that vein, *Abood*'s reasoning has been described as follows. The mere fact that nonunion members benefit from union speech is not enough to justify an agency fee because "private speech often furthers the interests of nonspeakers, and that does not alone empower the state to compel the speech to be paid for." *Lehnert*, 500 U. S., at 556 (opinion of SCALIA, J.). What justifies the agency fee, the argument goes, is the fact that the State compels the union to promote and protect the interests of nonmembers. *Ibid.* Specifically, the union must not discriminate between members and nonmembers in "negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances." *Ibid.* This means that the union "cannot, for example, negotiate particularly high wage increases for its members in exchange for accepting no increases for others." *Ibid.* And it has the duty to provide equal and effective representation for nonmembers in grievance proceedings, see Ill. Comp. Stat. Ann., ch. 5, §§315/6, 315/8, an undertaking that can be very involved. See, *e.g.*, SEIU: Member Resources, available at www.seiu.or/a/members/disputes-and-grievances-rights-procedures-and-best-practices.php (detailing the steps

involved in adjusting grievances).

This argument has little force in the situation now before us. Illinois law specifies that personal assistants "shall be paid at the hourly rate set by law," see 89 Ill. Admin. Code §686.40(a), and therefore the union cannot be in the position of having to sacrifice higher pay for its members in order to protect the nonmembers whom it is obligated to represent. And as for the adjustment of grievances, the union's authority and responsibilities are narrow, as we have seen. The union has no authority with respect to any grievances that a personal assistant may have with a customer, and the customer has virtually complete control over a personal assistant's work.

The union's limited authority in this area has important practical implications. Suppose, for example that a customer fires a personal assistant because the customer wrongly believes that the assistant stole a fork. Or suppose that a personal assistant is discharged because the assistant shows no interest in the customer's favorite daytime soaps. Can the union file a grievance on behalf of the assistant? The answer is no.

It is true that Illinois law requires a collective-bargaining agreement to "contain a grievance resolution procedure which shall apply to all employees in the bargaining unit," Ill. Comp. Stat., ch. 5, §315/8, but in the situation here, this procedure appears to relate solely to any grievance that a personal assistant may have with the State,[17] not with the customer for whom the personal

---

[17] Under the current collective-bargaining agreement, a "grievance" is "a dispute regarding the meaning or implementation of a specific provision brought by the Union or a Personal Assistant." App. 51; see also *id.*, at 51–54. "Neither the Union nor the Personal Assistant can grieve the hiring or termination of the Personal Assistant, reduction in the number of hours worked by the Personal Assistant or assigned to the Customer, and/or any action taken by the Customer." *Id.*, at 51. That apparently limits the union's role in grievance adjustments to the

assistant works.[18]

## 2

Because of *Abood*'s questionable foundations, and be-
cause the personal assistants are quite different from full-
fledged public employees, we refuse to extend *Abood* to the
new situation now before us.[19]   *Abood* itself has clear
boundaries; it applies to public employees.   Extending
those boundaries to encompass partial-public employees,
quasi-public employees, or simply private employees

—————
State's failure to perform its duties under the collective-bargaining
agreement, *e.g.*, if the State were to issue an incorrect paycheck, the
union  could bring a grievance.  See *id.*, at 48

[18] Contrary to the dissent's argument, *post*, at 10–11, the scope of the
union's bargaining authority has an important bearing on the question
whether *Abood* should be extended to the situation now before us.  As
we have explained, the best argument that can be mounted in support
of *Abood* is based on the fact that a union, in serving as the exclusive
representative of all the employees in a bargaining unit, is required by
law to engage in certain activities that benefit nonmembers and that
the union would not undertake if it did not have a legal obligation to do
so.   But where the law withholds from the union the authority to
engage in most of those activities, the argument for *Abood* is weakened.
Here, the dissent does not claim that the union's approach to negotia-
tions on wages or benefits would be any different if it were not required
to negotiate on behalf of the nonmembers as well as members.  And
there is no dispute that the law does not require the union to undertake
the burden of representing personal assistants with respect to their
grievances with customers; on the contrary, the law entirely excludes
the union from that process.  The most that the dissent can identify is
the union's obligation to represent nonmembers regarding grievances
with the State, but since most aspects of the personal assistants' work
is controlled entirely by the customers, this obligation is relatively
slight.   It bears little resemblance to the obligation imposed on the
union in *Abood*.

[19] It is therefore unnecessary for us to reach petitioners' argument
that *Abood* should be overruled, and the dissent's extended discussion
of *stare decisis* is beside the point.  Cf. *Stoneridge Investment Partners,
LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 164–166 (2008) (declining
to extend the "implied" right of action under §10(b) of the Securities
Exchange Act "beyond its present boundaries").

would invite problems.  Consider a continuum, ranging, on the one hand, from full-fledged state employees to, on the other hand, individuals who follow a common calling and benefit from advocacy or lobbying conducted by a group to which they do not belong and pay no dues.  A State may not force every person who benefits from this group's efforts to make payments to the group.  See *Lehnert*, 500 U. S., at 556 (opinion of SCALIA, J.).  But what if regulation of this group is increased?  What if the Federal Government or a State begins to provide or increases subsidies in this area?  At what point, short of the point at which the individuals in question become full-fledged state employees, should *Abood* apply?

If respondents' and the dissent's views were adopted, a host of workers who receive payments from a governmental entity for some sort of service would be candidates for inclusion within *Abood*'s reach.  Medicare-funded home health employees may be one such group.  See Brief for Petitioners 51; 42 U. S. C. §1395x(m); 42 CFR §424.22(a).  The same goes for adult foster care providers in Oregon (Ore. Rev. Stat. §443.733 (2013)) and Washington (Wash. Rev. Code §41.56.029 (2012)) and certain workers under the federal Child Care and Development Fund programs (45 CFR §98.2).

If we allowed *Abood* to be extended to those who are not full-fledged public employees, it would be hard to see just where to draw the line,[20] and we therefore confine *Abood*'s

<hr/>

[20] The dissent suggests that the concept of joint employment already supplies a clear line of demarcation, see *post*, at 8–9, but absent a clear statutory definition, employer status is generally determined based on a variety of factors that often do not provide a clear answer.  See generally 22 Illinois Jurisprudence: Labor and Employment §1:02 (2012); *American Federation of State, County and Municipal Employees, Council 31* v. *State Labor Relations Bd.*, 216 Ill. 2d 567, 578–582, 839 N. E. 2d 479, 486–487 (2005); *Manahan* v. *Daily News-Tribune*, 50 Ill. App. 3d 9, 12–16, 365 N. E. 2d 1045, 1048–1050 (1977).  More important, the joint-employer standard was developed for use in other

reach to full-fledged state employees.[21]

## IV

## A

Because *Abood* is not controlling, we must analyze the constitutionality of the payments compelled by Illinois law under generally applicable First Amendment standards. As we explained in *Knox,* "[t]he government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." 567 U. S., at ___ (slip op. at 8–9); see also, *e.g., R.A.V.* v. *St. Paul*, 505 U. S. 377, 382 (1992); *Riley* v. *National Federation of Blind of N.C.,* 487 U. S. 781, 797 (1988) *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943); *Wooley* v. *Maynard*, 430 U. S. 705, 713–715 (1977). And "compelled funding of the speech of other private speakers or groups" presents the same dangers as compelled speech. *Knox, supra,* at ___ (slip op. at 9). As a result, we explained in *Knox* that an agency-fee provision imposes "a 'significant impingement on First Amendment rights,'" and this cannot be tolerated unless it passes "exacting First Amendment scrutiny." 567 U. S., at ___ (slip op. at 9–10).

In *Knox*, we considered specific features of an agency-shop agreement—allowing a union to impose upon nonmembers a special assessment or dues increase without providing notice and without obtaining the nonmembers'

––––––––––

contexts. What matters here is whether the relationship between the State and the personal assistants is sufficient to bring this case within *Abood'*s reach.

[21] The dissent claims that our refusal to extend *Abood* to the Rehabilitation Program personal assistants produces a "perverse result" by penalizing the State for giving customers extensive control over the care they receive. *Post*, at 12. But it is not at all perverse to recognize that a State may exercise more control over its full-fledged employees than it may over those who are not full-fledged state employees or are privately employed.

affirmative agreement—and we held that these features
could not even satisfy the standard employed in *United
States* v. *United Foods, Inc.*, 533 U. S. 405, 415 (2001),
where we struck down a provision that compelled the
subsidization of commercial speech. We did not suggest,
however, that the compelled speech in *Knox* was like the
commercial speech in *United Foods*. On the contrary, we
observed that "[t]he subject of the speech at issue [in
*United Foods*]—promoting the sale of mushrooms—was
not one that is likely to stir the passions of many, but the
mundane commercial nature of that speech only high-
lights the importance of our analysis and our holding."
*Knox*, *supra,* at ___ (slip op. at 9).

While the features of the agency-fee provision in *Knox*
could not meet even the commercial-speech standard
employed in *United Foods*, it is apparent that the speech
compelled in this case is not commercial speech. Our
precedents define commercial speech as "speech that does
no more than propose a commercial transaction," *United
Foods*, *supra*, at 409 (citing *Virginia Bd. of Pharmacy* v.
*Virginia Citizens Consumer Council, Inc.*, 425 U. S.
748, 761–762 (1976)), and the union speech in question in
this case does much more than that. As a consequence,
it is arguable that the *United Foods* standard is too
permissive.

B

For present purposes, however, no fine parsing of levels
of First Amendment scrutiny is needed because the agency-
fee provision here cannot satisfy even the test used in
*Knox.* Specifically, this provision does not serve a "'com-
pelling state interes[t] . . . that cannot be achieved through
means significantly less restrictive of associational free-
doms.'" *Knox*, *supra,* at ___ (slip op. at 10) (quoting *Rob-
erts* v. *United States Jaycees*, 468 U. S. 609, 623 (1984)).
Respondents contend that the agency-fee provision in this

case furthers several important interests, but none is sufficient.

1

Focusing on the benefits of the union's status as the exclusive bargaining agent for all employees in the unit, respondents argue that the agency-fee provision promotes "labor peace," but their argument largely misses the point. Petitioners do not contend that they have a First Amendment right to form a rival union. Nor do they challenge the authority of the SEIU–HII to serve as the exclusive representative of all the personal assistants in bargaining with the State. All they seek is the right not to be forced to contribute to the union, with which they broadly disagree.

A union's status as exclusive bargaining agent and the right to collect an agency fee from non-members are not inextricably linked. For example, employees in some federal agencies may choose a union to serve as the exclusive bargaining agent for the unit, but no employee is required to join the union or to pay any union fee. Under federal law, in agencies in which unionization is permitted, "[e]ach employee shall have the right to form, join, or assist any labor organization, *or to refrain from any such activity*, freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right." 5 U. S. C. §7102 (emphasis added).[22]

Moreover, even if the agency fee provision at issue here were tied to the union's status as exclusive bargaining agents, features of the Illinois scheme would still undermine the argument that the agency fee plays an important role in maintaining labor peace. For one thing, any threat to labor peace is diminished because the personal assis-

---

[22] A similar statute adopts the same rule specifically as to the U. S. Postal Service. See 39 U. S. C. §1209(c).

tants do not work together in a common state facility but instead spend all their time in private homes, either the customers' or their own. Cf. *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 51 (1983) ("[E]xclusion of the rival union may reasonably be considered a means of insuring labor-peace within the schools"). Federal labor law reflects the fact that the organization of household workers like the personal assistants does not further the interest of labor peace. "[A]ny individual employed . . . in the domestic service of any family or person at his home" is excluded from coverage under the National Labor Relations Act. See 29 U. S. C. §152(3).

The union's very restricted role under the Illinois law is also significant. Since the union is largely limited to petitioning the State for greater pay and benefits, the specter of conflicting demands by personal assistants is lessened. And of course, State officials must deal on a daily basis with conflicting pleas for funding in many contexts.

2

Respondents also maintain that the agency-fee provision promotes the welfare of personal assistants and thus contributes to the success of the Rehabilitation Program. As a result of unionization, they claim, the wages and benefits of personal assistants have been substantially improved;[23] orientation and training programs, background checks, and a program to deal with lost and erroneous paychecks have been instituted;[24] and a procedure was established to resolve grievances arising under the collective-bargaining agreement (but apparently not

_____

[23] Wages rose from $7 per hour in 2003 to $13 per hour in 2014. Brief for Respondent Quinn 7. Current wages, according to respondents, are $11.65 per hour. Brief for Respondent SEIU–HII 6.

[24] See generally Brief for Respondent Quinn 6–8; Brief for Respondent SEIU–HII 6.

grievances relating to a Service Plan or actions taken by a customer).[25]

The thrust of these arguments is that the union has been an effective advocate for personal assistants in the State of Illinois, and we will assume that this is correct. But in order to pass exacting scrutiny, more must be shown. The agency-fee provision cannot be sustained unless the cited benefits for personal assistants could not have been achieved if the union had been required to depend for funding on the dues paid by those personal assistants who chose to join. No such showing has been made.

In claiming that the agency fee was needed to bring about the cited improvements, the State is in a curious position. The State is not like the closed-fisted employer that is bent on minimizing employee wages and benefits and that yields only grudgingly under intense union pressure. As Governor Blagojevich put it in the executive order that first created the Illinois program, the State took the initiative because it was eager for "feedback" regarding the needs and views of the personal assistants. See App. to Pet. for Cert. 46. Thereafter, a majority of the personal assistants voted to unionize. When they did so, they must have realized that this would require the payment of union dues, and therefore it may be presumed that a high percentage of these personal assistants became union members and are willingly paying union dues. Why are these dues insufficient to enable the union to provide "feedback" to a State that is highly receptive to suggestions for increased wages and other improvements? A host of organizations advocate on behalf of the interests of persons falling within an occupational group, and many of these groups are quite successful even though they are dependent on voluntary contributions. Respondents'

————————
[25] See Brief for Respondent Quinn 7.

showing falls far short of what the First Amendment demands.

## V

Respondents and their supporting *amici* make two additional arguments that must be addressed.

## A

First, respondents and the Solicitor General urge us to apply a balancing test derived from *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968). See Brief for Respondent Quinn 25–26; Brief for SEIU–HII 35–36; Brief for *United States* as *Amicus Curiae* 11. And they claim that under the *Pickering* analysis, the Illinois scheme must be sustained. This argument represents an effort to find a new justification for the decision in *Abood*, because neither in that case nor in any subsequent related case have we seen *Abood* as based on *Pickering* balancing.[26]

In any event, this effort to recast *Abood* falls short. To begin, the *Pickering* test is inapplicable because with respect to the personal assistants, the State is not acting in a traditional employer role.[27] But even if it were, appli-

---

[26] The *Abood* majority cited *Pickering* once, in a footnote, for the proposition that "there may be limits on the extent to which an employee in a sensitive or policymaking position may freely criticize his superiors and the policies they espouse." 431 U. S., at 230, n. 27. And it was cited once in Justice Powell's concurrence, for the uncontroversial proposition that "'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Id.,* at 259 (opinion concurring in judgment) (quoting *Pickering*, 391 U. S., at 568). *United States* v. *United Foods, Inc.,* 533 U. S. 405 (2001), cited *Pickering* only once—in dissent. 533 U. S., at 425 (opinion of BREYER, J.). Neither *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984), nor *Knox* cited *Pickering* a single time.

[27] Nor is the State acting as a "proprietor in managing its internal operations" with respect to personal assistants. See *NASA* v. *Nelson*,

cation of *Pickering* would not sustain the agency-fee provision.

*Pickering* and later cases in the same line concern the constitutionality of restrictions on speech by public employees. Under those cases, employee speech is unprotected if it is not on a matter of public concern (or is pursuant to an employee's job duties), but speech on matters of public concern may be restricted only if "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern." 391 U. S., at 568. See also *Borough of Duryea* v. *Guarnieri*, 564 U. S. ___ (2011); *Garcetti* v. *Ceballos*, 547 U. S. 410 (2006); *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion); *Connick* v. *Myers*, 461 U. S. 138 (1983).

Attempting to fit *Abood* into the *Pickering* framework, the United States contends that union speech that is germane to collective bargaining does not address matters of public concern and, as a result, is not protected. Taking up this argument, the dissent insists that the speech at issue here is not a matter of public concern. According to the dissent, this is "the prosaic stuff of collective bargaining." *Post*, at 9. Does it have any effect on the public? The dissent's answer is: "not terribly much." *Post*, at 20. As the dissent sees it, speech about such funding is not qualitatively different from the complaints of a small-town police chief regarding such matters as the denial of $338 in overtime pay or directives concerning the use of police vehicles and smoking in the police station. See *post*, at 20; *Borough of Duryea*, *supra,* at ___ (slip op. at 3).[28]

––––––––––

562 U. S. ___ (2011) (slip op. at 1–2, 14).

[28] The dissent misunderstands or mischaracterizes our cases in this line. We have never held that the wages paid to a public-sector bargaining unit are not a matter of public concern. The $338 payment at issue in *Guarnieri* had a negligible impact on public coffers, but pay-

This argument flies in the face of reality. In this case, for example, the category of union speech that is germane to collective bargaining unquestionably includes speech in favor of increased wages and benefits for personal assistants. Increased wages and benefits for personal assistants would almost certainly mean increased expenditures under the Medicaid program, and it is impossible to argue that the level of Medicaid funding (or, for that matter, state spending for employee benefits in general) is not a matter of great public concern.

In recent years, Medicaid expenditures have represented nearly a quarter of all state expenditures. See National Association of State Budget Officers, Summary: Fall 2013 Fiscal Survey of States (Dec. 10, 2013), online at http://www.nasbo.org. "Medicaid has steadily eaten up a growing share of state budgets."[29] In fiscal year 2014, "[t]hirty-five states increased spending for Medicaid for a net increase of $6.8 billion." *Ibid.* Accordingly, speech by a powerful union that relates to the subject of Medicaid funding cannot be equated with the sort of speech that our cases have treated as concerning matters of only private concern. See, *e.g.*, *San Diego* v. *Roe*, 543 U. S. 77 (2004) (*per curiam*); *Connick*, *supra*, at 148 (speech that "reflect[ed] one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a *cause célèbre*" (emphasis added)).

For this reason, if *Pickering* were to be applied, it would

--------

ments made to public-sector bargaining units may have massive implications for government spending. See *supra,* at 18, and n. 7. That is why the dissent's "analogy," *post*, at 20–21, is not illustrative at all. We do not doubt that a single public employee's pay is usually not a matter of public concern. But when the issue is pay for an entire collective-bargaining unit involving millions of dollars, that matter affects statewide budgeting decisions.

[29] See Cooper, Bigger Share of State Cash for Medicaid, N. Y. Times, Dec. 14, 2011.

be necessary to proceed to the next step of the analysis prescribed in that case, and this would require an assessment of both the degree to which the agency-fee provision promotes the efficiency of the Rehabilitation Program and the degree to which that provision interferes with the First Amendment interests of those personal assistants who do not wish to support the union.

We need not discuss this analysis at length because it is covered by what we have already said. Agency-fee provisions unquestionably impose a heavy burden on the First Amendment interests of objecting employees. See *Knox*, 567 U. S., at \_\_\_ (slip op. at 19) (citing *Lehnert*, 500 U. S., at 513; *Jibson* v. *Michigan Ed. Assn.*, 30 F. 3d 723, 730 (CA6 1994). And on the other side of the balance, the arguments on which the United States relies—relating to the promotion of labor peace and the problem of free riders—have already been discussed. Thus, even if the permissibility of the agency-shop provision in the collective-bargaining agreement now at issue were analyzed under *Pickering*, that provision could not be upheld.

B

Respondents contend, finally, that a refusal to extend *Abood* to cover the situation presented in this case will call into question our decisions in *Keller* v. *State Bar of Cal.* 496 U. S. 1 (1990), and *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217 (2000). Respondents are mistaken.

In *Keller*, we considered the constitutionality of a rule applicable to all members of an "integrated" bar, *i.e.*, "an association of attorneys in which membership and dues are required as a condition of practicing law." 496 U. S., at 5. We held that members of this bar could not be required to pay the portion of bar dues used for political or ideological purposes but that they could be required to pay the portion of the dues used for activities connected with

proposing ethical codes and disciplining bar members. *Id.*, at 14.

This decision fits comfortably within the framework applied in the present case. Licensed attorneys are subject to detailed ethics rules, and the bar rule requiring the payment of dues was part of this regulatory scheme. The portion of the rule that we upheld served the "State's interest in regulating the legal profession and improving the quality of legal services." *Ibid.* States also have a strong interest in allocating to the members of the bar, rather than the general public, the expense of ensuring that attorneys adhere to ethical practices. Thus, our decision in this case is wholly consistent with our holding in *Keller*.

Contrary to respondents' submission, the same is true with respect to *Southworth, supra.* In that case, we upheld the constitutionality of a university-imposed mandatory student activities fee that was used in part to support a wide array of student groups that engaged in expressive activity. The mandatory fee was challenged by students who objected to some of the expression that the fee was used to subsidize, but we rejected that challenge, and our holding is entirely consistent with our decision in this case.

Public universities have a compelling interest in promoting student expression in a manner that is viewpoint neutral. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995). This may be done by providing funding for a broad array of student groups. If the groups funded are truly diverse, many students are likely to disagree with things that are said by some groups. And if every student were entitled to a partial exemption from the fee requirement so that no portion of the student's fee went to support a group that the student did not wish to support, the administrative problems would likely be insuperable. Our decision today thus does not undermine

*Southworth.*

\*    \*    \*

For all these reasons, we refuse to extend *Abood* in the manner that Illinois seeks. If we accepted Illinois' argument, we would approve an unprecedented violation of the bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support. The First Amendment prohibits the collection of an agency fee from personal assistants in the Rehabilitation Program who do not want to join or support the union.

The judgment of the Court of Appeals is reversed in part and affirmed in part,[30] and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

--------

[30] The Court of Appeals held—and we agree—that the First Amendment claims of the petitioners who work, not in the Rehabilitation Program, but in a different but related program, the "Disabilities Program," are not ripe. This latter program is similar in its basic structure to the Rehabilitation Program, see App. to Pet. for Cert. 14a, but the Disabilities Program personal assistants have not yet unionized. The Disabilities Program petitioners claim that under Illinois Executive Order No. 2009–15, they face imminent unionization and, along with it, compulsory dues payments. Executive Order No. 2009–15, they note, is "almost identical to EO 2003–08, except that it targets providers in the Disabilities Program." Brief for Petitioners 10.

In a 2009 mail-ballot election, the Disabilities Program personal assistants voted down efforts by SEIU Local 73 and American Federation State, County and Municipal Employees Council 31 to become their representatives. See App. 27. The record before us does not suggest that there are any further elections currently scheduled. Nor does the record show that any union is currently trying to obtain certification through a card check program. Under these circumstances, we agree with the holding of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–681

_____

PAMELA HARRIS, ET AL, PETITIONERS *v.* PAT QUINN,
GOVERNOR OF ILLINOIS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 30, 2014]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join, dissenting.

*Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), answers the question presented in this case. *Abood* held that a government entity may, consistently with the First Amendment, require public employees to pay a fair share of the cost that a union incurs negotiating on their behalf for better terms of employment. That is exactly what Illinois did in entering into collective bargaining agreements with the Service Employees International Union Healthcare (SEIU) which included fair-share provisions. Contrary to the Court's decision, those agreements fall squarely within *Abood*'s holding. Here, Illinois employs, jointly with individuals suffering from disabilities, the in-home care providers whom the SEIU represents. Illinois establishes, following negotiations with the union, the most important terms of their employment, including wages, benefits, and basic qualifications. And Illinois's interests in imposing fair-share fees apply no less to those caregivers than to other state workers. The petitioners' challenge should therefore fail.

And that result would fully comport with our decisions applying the First Amendment to public employment. *Abood* is not, as the majority at one point describes it,

"something of an anomaly," allowing uncommon interfer-
ence with individuals' expressive activities. *Ante*, at 8.
Rather, the lines it draws and the balance it strikes reflect
the way courts generally evaluate claims that a condition
of public employment violates the First Amendment. Our
decisions have long afforded government entities broad
latitude to manage their workforces, even when that
affects speech they could not regulate in other contexts.
*Abood* is of a piece with all those decisions: While protect-
ing an employee's most significant expression, that deci-
sion also enables the government to advance its interests
in operating effectively—by bargaining, if it so chooses,
with a single employee representative and preventing free
riding on that union's efforts.

For that reason, one aspect of today's opinion is cause
for satisfaction, though hardly applause. As this case
came to us, the principal question it presented was whether
to overrule *Abood*: The petitioners devoted the lion's
share of their briefing and argument to urging us to over-
turn that nearly 40-year-old precedent (and the respond-
ents and *amici* countered in the same vein). Today's
majority cannot resist taking potshots at *Abood*, see *ante*,
at 17–20, but it ignores the petitioners' invitation to de-
part from principles of *stare decisis*. And the essential
work in the majority's opinion comes from its extended
(though mistaken) distinction of *Abood*, see *ante*, at 20–28,
not from its gratuitous dicta critiquing *Abood*'s founda-
tions. That is to the good—or at least better than it might
be. The *Abood* rule is deeply entrenched, and is the foun-
dation for not tens or hundreds, but thousands of contracts
between unions and governments across the Nation. Our
precedent about precedent, fairly understood and applied,
makes it impossible for this Court to reverse that decision.

## I

I begin where this case should also end—with this

Court's decision in *Abood*. There, some public school teachers in Detroit challenged a clause in their collective bargaining agreement compelling non-union members to pay the union a service charge equivalent to regular dues. The Court upheld the requirement so long as the union was using the money for "collective bargaining, contract administration, and grievance adjustment," rather than for political or ideological activities. 431 U. S., at 225–226. In so doing, the Court acknowledged that such a fair-share provision "has an impact upon [public employees'] First Amendment interests"; employees, after all, might object to policies adopted or "activities undertaken by the union in its role as exclusive representative." *Id.*, at 222. Still, the Court thought, the government's own interests "constitutionally justified" the interference. *Ibid.* Detroit had decided, the Court explained, that bargaining with a single employee representative would promote "labor stability" and peaceful labor relations—by ensuring, for example, that different groups of employees did not present "conflicting demands." *Id.*, at 221, 229. And because such an exclusive bargaining agent has a legal duty to represent all employees, rather than just its own members, a compulsory surcharge fairly distributes "the cost of [bargaining] among those who benefit" and "counteracts the incentive that employees might otherwise have to become 'free riders.'" *Id.*, at 222.

This case thus raises a straightforward question: Does *Abood* apply equally to Illinois's care providers as to Detroit's teachers? No one thinks that the fair-share provisions in the two cases differ in any relevant respect. Nor do the petitioners allege that the SEIU is crossing the line *Abood* drew by using their payments for political or ideological activities. The only point in dispute is whether it matters that the personal assistants here are employees not only of the State but also of the disabled persons for whom they care. Just as the Court of Appeals held, that

fact should make no difference to the analysis. See 656
F. 3d 692, 698 (CA7 2011).

To see how easily *Abood* resolves this case, consider how
Illinois structured the petitioners' employment, and also
why it did so. The petitioners work in Illinois's Medicaid-
funded Rehabilitation Program, which provides in-home
services to persons with disabilities who otherwise would
face institutionalization. Under the program, each disa-
bled person (the State calls them "customers") receives
care from a personal assistant; the total workforce exceeds
20,000. The State could have asserted comprehensive
control over all the caregivers' activities. But because of
the personalized nature of the services provided, Illinois
instead chose (as other States have as well) to share au-
thority with the customers themselves. The result is that
each caregiver has joint employers—the State and the
customer—with each controlling significant aspects of the
assistant's work.[1]

For its part, Illinois sets all the workforce-wide terms of
employment. Most notably, the State determines and
pays the employees' wages and benefits, including health
insurance (while also withholding taxes). See 89 Ill.
Admin. Code §§686.10(h)(10), 686.40(a)–(b) (2007); App. 44–
46. By regulation, Illinois establishes the job's basic quali-
fications: for example, the assistant must provide refer-
ences or recommendations and have adequate experience
and training for the services given. See §§686.10(c), (f).
So too, the State describes the services any personal assis-

———————

[1] The majority describes the petitioners as "partial" or "quasi" public
employees, a label of its own devising. *Ante*, at 28. But employment
law has a real name—joint employees—for workers subject at once to
the authority of two or more employers (a not uncommon phenomenon).
See, *e.g.*, 29 CFR §791.2 (2013); *Boire* v. *Greyhound Corp.*, 376 U. S.
473, 475 (1964). And the Department of Labor recently explained that
in-home care programs, if structured like Illinois's, establish joint
employment relationships. See 78 Fed. Reg. 60483–60484 (2013).

tant may provide, and prescribes the terms of standard employment contracts entered into between personal assistants and customers. See §§686.10(h), 686.20.

Illinois as well structures the individual relationship between the customer and his assistant (in ways the majority barely acknowledges). Along with both the customer and his physician, a state-employed counselor develops a service plan laying out the assistant's specific job responsibilities, hours, and working conditions. See §§684.10, 684.50. That counselor also assists the customer in conducting a state-mandated annual performance review, based on state-established criteria, and mediates any resulting disagreements. See §686.30.

Within the structure designed by the State, the customer of course has crucial responsibilities. He exercises day-to-day supervisory control over the personal assistant. See §676.30(b). And he gets both to hire a particular caregiver (from among the pool of applicants Illinois has deemed qualified) and to impose any needed discipline, up to and including discharge. See *ibid.*; §677.40(d). But even as to those matters, the State plays a role. Before a customer may hire an assistant, the counselor must sign off on the employee's ability to follow the customer's directions and communicate with him. See §§686.10(d)–(e) (requiring that the employee demonstrate these capabilities "to the satisfaction of" the counselor). And although only a customer can actually fire an assistant, the State can effectively do so by refusing to pay one who fails to "meet [state] standards." §677.40(d). The majority reads that language narrowly, see *ante*, at 3, n. 1, 22, but the State does not: It has made clear not just in its litigation papers, but also in its collective bargaining agreements and customer guidance that it will withhold payment from an assistant (or altogether disqualify her from the program) based on credible allegations of customer abuse, neglect, or financial exploitation. See App. 55; Brief for

Respondent Quinn 3, 50; Ill. Dept. of Human Servs., Customer Guidance for Managing Providers 8, online at http://www.dhs.state.il.us/OneNetLibrary/27897/documents/ Brochures/4365.pdf (as visited June 27, 2014, and available in Clerk of Court's case file).[2]

Given that set of arrangements, *Abood* should control. Although a customer can manage his own relationship with a caregiver, Illinois has sole authority over every workforce-wide term and condition of the assistants' employment—in other words, the issues most likely to be the subject of collective bargaining. In particular, if an assistant wants an increase in pay, she must ask the State, not the individual customer. So too if she wants better benefits. (Although the majority notes that caregivers do not receive *statutory* retirement and health insurance benefits, see *ante*, at 22, that is irrelevant: Collective bargaining between the State and SEIU has focused on benefits from the beginning, and has produced state-funded health insurance for personal assistants.) And because it is Illinois that would sit down at a bargaining table to address those subjects—the ones that matter most to employees and so most affect workforce stability—the State's stake in a fair-share provision is the same as in *Abood.* Here too, the State has an interest in promoting effective operations by negotiating with an equitably and adequately funded exclusive bargaining agent over terms and conditions of employment. That Illinois has delegated to program customers various individualized employment issues makes no difference to those state interests. If anything, as the State has contended, the dispersion of employees across numerous workplaces and the absence of

––––––––

[2] Indeed, pursuant to the grievance procedure in the present collective bargaining agreement, the SEIU obtained an arbitration award reversing the State's decision to disqualify an assistant from the program for such reasons. See Brief for Respondent SEIU 7 (citing Doc. No. 32–5 in Case No. 10–cv–02477 (ND Ill.)).

day-to-day state supervision provides an additional reason for Illinois to want to "address concerns common to all personal assistants" by negotiating with a single representative: Only in that way, the State explains, can the employees effectively convey their concerns about employment under the Rehabilitation Program. App. to Pet. for Cert. 46a (Exec. Order No. 2003–8).

Indeed, the history of that program forcefully demonstrates Illinois's interest in bargaining with an adequately funded exclusive bargaining agent—that is, the interest *Abood* recognized and protected. Workforce shortages and high turnover have long plagued in-home care programs, principally because of low wages and benefits. That labor instability lessens the quality of care, which in turn, forces disabled persons into institutions and (massively) increases costs to the State. See Brief for Paraprofessional Healthcare Institute as *Amicus Curiae* 16–26; Brief for State of California et al. as *Amici Curiae* 4–5. The individual customers are powerless to address those systemic issues; rather, the State—because of its control over workforce-wide terms of employment—is the single employer that can do so. And here Illinois determined (as have nine other States, see Brief for Respondent SEIU 51, n. 14) that negotiations with an exclusive representative offered the best chance to set the Rehabilitation Program on firmer footing. Because of that bargaining, as the majority acknowledges, home-care assistants have nearly doubled their wages in less than 10 years, obtained state-funded health insurance, and benefited from better training and workplace safety measures. See *ante,* at 32–33; Brief for Respondent Quinn 7; App. 44–48. The State, in return, has obtained guarantees against strikes or other work stoppages, see *id.*, at 55—and most important, believes it has gotten a more stable workforce providing higher quality care, thereby avoiding the costs associated with institutionalization. Illinois's experience thus might serve as a

veritable poster child for *Abood*—not, as the majority would have it, some strange extension of that decision.

It is not altogether easy to understand why the majority thinks what it thinks: Today's opinion takes the tack of throwing everything against the wall in the hope that something might stick. A vain hope, as it turns out. Even once disentangled, the various strands of the majority's reasoning do not distinguish this case from *Abood*.

Parts of the majority's analysis appear to rest on the simple presence of another employer, possessing significant responsibilities, in addition to the State. See *ante,* at 20–22, 24. But this Court's cases provide no warrant for holding that joint public employees are not real ones. To the contrary, the Court has made clear that the government's wide latitude to manage its workforce extends to such employees, even as against their First Amendment claims. The government's prerogative as employer, we recently explained, turns not on the "formal status" of an employee, but on the nature of the public "interests at stake"; we therefore rejected the view that "the Government's broad authority in managing its affairs should apply with diminished force" to contract employees whose "direct employment relationship" is with another party. *NASA* v. *Nelson*, 562 U. S. ___, ___ (2011) (slip op., at 14–15). And indeed, we reached the same result (in language that might have been written for this case) when such employees "d[id] not work at the government's workplace[,] d[id] not interact daily with government officers and employees," and were not subject to the government's "day-to-day control" over "the details of how work is done." *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr*, 518 U. S. 668, 676–677 (1996).[3] Here, as I have explained, Illinois's

_____

[3] The majority claims that the Court developed this law "for use in other contexts," *ante*, at 28–29, n. 20*,* but that is true only in the narrowest sense. The decisions I cite dealt with First Amendment

interests as an employer and program administrator are
substantial, see *supra*, at 4–6; and accordingly, the State's
sharing of employment responsibilities with another party
should not matter.[4]

Next, the majority emphasizes that the Illinois Legisla-
ture deemed personal assistants "public employees" solely
"for the purposes of coverage under the Illinois Public
Labor Relations Act" and not for other purposes, like
granting statutory benefits and incurring vicarious liabil-
ity in tort. Ill. Comp. Stat., ch. 20, §2405/3(f) (West 2012);
see *ante*, at 6, 22–23; but cf. *Martin* v. *Illinois*, 2005 WL
2267733, *5–*8 (Ill. Workers' Compensation Comm'n, July
26, 2005) (treating caregivers as public employees for
purposes of workers' compensation).[5] But once again, it is
hard to see why that fact is relevant. The majority must
agree (this Court has made the point often enough) that

——————

claims that joint or contract employees made against the government.
The only difference is that those suits challenged different restrictions
on the employees' expressive activities.

[4] In a related argument, the majority frets that if *Abood* extends to
the joint employees here, a "host of workers who receive payments from
a governmental entity for some sort of service would be candidates for
inclusion within *Abood*'s reach." *Ante*, at 28. But as I have just shown,
this Court has not allowed such worries about line-drawing to limit the
government's authority over joint and contract employees in the past.
And rightly so, because whatever close cases may arise at the margin
(there always are some), the essential distinction between such employ-
ees and mere recipients of government funding is not hard to maintain.
Consider again the combination of things Illinois does here: set wages,
provide benefits, administer payroll, withhold taxes, set minimum
qualifications, specify terms of standard contracts, develop individual-
ized service plans, fund orientation and training, facilitate annual
reviews, and resolve certain grievances. That combination of functions
places the petitioners so securely on one side of the boundary between
public employees and mere recipients of public funding as to justify
deferral of line-drawing angst to another case.

[5] As the opinion's quadruple repetition of the words "appear" and
"apparently" suggests, *ante*, at 22–23, the majority is mostly guessing
as to in-home caregivers' eligibility for various state programs.

"state law labels," adopted for a whole host of reasons, do not determine whether the State is acting as an employer for purposes of the First Amendment. *E.g.*, *Umbehr*, 518 U. S., at 679. The true issue is whether Illinois has a sufficient stake in, and control over, the petitioners' terms and conditions of employment to implicate *Abood*'s rationales and trigger its application. And once more, that question has a clear answer: As I have shown, Illinois negotiates all workforce-wide terms of the caregivers' employment as part of its effort to promote labor stability and effectively administer its Rehabilitation Program. See *supra*, at 6–8. As contrasted to that all-important fact, whether Illinois incurs vicarious liability for caregivers' torts, see *ante*, at 23, or grants them certain statutory benefits like health insurance, see *ante*, at 22, is beside the point. And still more so because the State and SEIU can *bargain* over most such matters; for example, as I have noted, the two have reached agreement on providing state-funded health coverage, see *supra*, at 7.

Further, the majority claims, "the scope of bargaining" that the SEIU may conduct for caregivers is "circumscribed" because the customer has authority over individualized employment matters like hiring and firing. *Ante*, at 23–25. But (at the risk of sounding like a broken record) so what? Most States limit the scope of permissible bargaining in the public sector—often ruling out of bounds similar, individualized decisions. See R. Kearney & P. Mareschal, Labor Relations in the Public Sector 75–77 (5th ed. 2014) ("The great majority of state statutes" exclude "certain matters from the scope of negotiations," including, for example, personnel decisions respecting "hiring, promotion, and dismissal"); Note, Developments in the Law—Public Employment, 97 Harv. L. Rev. 1611, 1684 (1984) (Many state statutes "explicitly limit[ ] the scope of bargaining, typically by excluding decisions on personnel management"). Here, the scope of collective

bargaining—over wages and benefits, as well as basic duties and qualifications—more than suffices to implicate the state interests justifying *Abood*. Those are the matters, after all, most likely to concern employees generally and thus most likely to affect the nature and quality of the State's workforce. The idea that *Abood* applies only if a union can bargain with the State over every issue comes from nowhere and relates to nothing in that decision—and would revolutionize public labor law.

Finally, the majority places weight on an idiosyncrasy of Illinois law: that a regulation requires uniform wages for all personal assistants. See *ante*, at 25. According to the majority, that means *Abood*'s free-rider rationale "has little force in the situation now before us": Even absent the duty of fair representation (requiring the union to work on behalf of all employees, members and non-members alike, see *infra*, at 22–23), the union could not bargain one employee's wages against another's. *Ante*, at 26.[6] But that idea is doubly wrong. First, the Illinois regulation applies only to wages. It does not cover, for example, the significant health benefits that the SEIU has obtained for in-home caregivers, or any other benefits for which it may bargain in the future. Nor does the regulation prevent preferential participation in the grievance process, which governs all disputes between Illinois and caregivers arising from the terms of their agreement. See n. 2, *supra*. And second, even if the regulation covered everything subject to collective bargaining, the majority's reasoning is a non-sequitur. All the regulation would do then is serve as suspenders to the duty of fair representation's belt: That Illinois has *two* ways to ensure that the results of

——————

[6] The majority also suggests in this part of its opinion that even if the union had latitude to demand higher wages only for its own supporters, it would not do so. See *ante*, at 27, n. 18. But why not? A rational union, in the absence of any legal obligation to the contrary, would almost surely take that approach to bargaining.

collective bargaining redound to the benefit of all employees serves to compound, rather than mitigate, the union's free-rider problem.

As far as I can tell, that covers the majority's reasons for distinguishing this case from *Abood*. And even when considered in combination, as the majority does, they do not succeed. What makes matters still worse is the perverse result of the majority's decision: It penalizes the State for giving disabled persons some control over their own care. If Illinois had structured the program, as it could have, to centralize every aspect of the employment relationship, no question could possibly have arisen about *Abood*'s application. Nothing should change because the State chose to respect the dignity and independence of program beneficiaries by allowing them to select and discharge, as well as supervise day-to-day, their own caregivers. A joint employer remains an employer, and here, as I have noted, Illinois kept authority over all workforce-wide terms of employment—the very issues most likely to be the subject of collective bargaining. The State thus should also retain the prerogative—as part of its effort to "ensure efficient and effective delivery of personal care services"—to require all employees to contribute fairly to their bargaining agent. App. to Pet. for Cert. 45a (Exec. Order No. 2003–8).

## II

Perhaps recognizing the difficulty of plausibly distinguishing this case from *Abood*, the petitioners raised a more fundamental question: the continued viability of *Abood* as to *all* public employees, even what the majority calls "full-fledged" ones. *Ante,* at 9. That issue occupied the brunt of the briefing and argument in this Court. See, *e.g.*, Brief for Petitioners 16–24; Brief for Respondent SEIU 15–44; Brief for Respondent Quinn 15–29; Brief for United States as *Amicus Curiae* 14–28; Tr. of Oral Arg. 5–

21, 32–39, 42–47, 50–60. The majority declines the petitioners' request to overturn precedent—and rightly so: This Court does not have anything close to the special justification necessary to overturn *Abood*. Still, the majority cannot restrain itself from providing a critique of that decision, suggesting that it might have resolved the case differently in the first instance. That dicta is off-base: *Abood* corresponds precisely to this Court's overall framework for assessing public employees' First Amendment claims. To accept that framework, while holding *Abood* at arms-length, is to wish for a *sui generis* rule, lacking in justification, applying exclusively to union fees.

A

This Court's view of *stare decisis* makes plain why the majority cannot—and did not—overturn *Abood*. That doctrine, we have stated, is a "foundation stone of the rule of law." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. ___, ___ (2014) (slip op., at 15). It "promotes the evenhanded, predictable, and consistent development of legal principles [and] fosters reliance on judicial decisions." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). As important, it "contributes to the actual and perceived integrity of the judicial process," *ibid.*, by ensuring that decisions are "founded in the law rather than in the proclivities of individuals," *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). For all those reasons, this Court has always held that "any departure" from precedent "demands special justification." *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984).

And *Abood* is not just any precedent: It is entrenched in a way not many decisions are. Over nearly four decades, we have cited *Abood* favorably numerous times, and we have repeatedly affirmed and applied its core distinction between the costs of collective bargaining (which the government can demand its employees share) and those of

political activities (which it cannot). See, *e.g.*, *Locke* v. *Karass*, 555 U. S. 207, 213–214 (2009); *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 519 (1991); *Teachers* v. *Hudson*, 475 U. S. 292, 301–302 (1986); *Ellis* v. *Railway Clerks*, 466 U. S. 435, 455–457 (1984). Reviewing those decisions, this Court recently—and unanimously—called the *Abood* rule "a general First Amendment principle." *Locke*, 555 U. S., 213–215. And indeed, the Court has relied on that rule in deciding cases involving compulsory fees outside the labor context—which today's majority reaffirms as good law, see *ante*, at 37–39. See, *e.g.*, *Keller* v. *State Bar of Cal.*, 496 U. S. 1, 9–17 (1990) (state bar fees); *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 230–232 (2000) (public university student fees); *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457, 471–473 (1997) (commercial advertising assessments). Not until two years ago, in *Knox* v. *Service Employees*, 567 U. S. ___ (2012), did the Court so much as whisper (there without the benefit of briefing or argument, see *id.*, at ___ (SOTOMAYOR, J., concurring in judgment) (slip op., at 1–6)) that it had any misgivings about *Abood*.

Perhaps still more important, *Abood* has created enormous reliance interests. More than 20 States have enacted statutes authorizing fair-share provisions, and on that basis public entities of all stripes have entered into multi-year contracts with unions containing such clauses. "*Stare decisis* has added force," we have held, when overturning a precedent would require "States to reexamine [and amend] their statutes." *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202–203 (1991). And on top of that, "[c]onsiderations in favor of *stare decisis* are at their acme in cases involving property and contract rights." *Payne*, 501 U. S., at 828. Here, governments and unions across the country have entered into thousands of contracts involving millions of employees in reliance on

*Abood*. Reliance interests do not come any stronger.

The majority's criticisms of *Abood* do not remotely defeat those powerful reasons for adhering to the decision. The special justifications needed to reverse an opinion must go beyond demonstrations (much less assertions) that it was wrong; that is the very point of *stare decisis*. And the majority's critique extends no further. It is mostly just a catalog of errors *Abood* supposedly committed—reproaches that could have been leveled as easily 40 years ago as today. Only the idea that *Abood* did not "anticipate" or "foresee" the difficulties of distinguishing between collective bargaining and political activities, see *ante*, at 18–19, might be thought different. But in fact, *Abood* predicted precisely those issues. See 431 U. S., at 236 ("There will, of course, be difficult problems in drawing lines between collective-bargaining . . . and ideological activities"). It simply disagreed with today's majority about whether in this context, as in many others, lines that are less than pristine are still worth using. And in any event, the majority much overstates the difficulties of classifying union expenditures. The Court's most recent decision on the subject unanimously resolved the single issue that had divided lower courts. See *Locke*, 555 U. S., at 217–221. So it is not surprising that the majority fails to offer any concrete examples of thorny classification problems. If the kind of hand-wringing about blurry lines that the majority offers were enough to justify breaking with precedent, we might have to discard whole volumes of the U. S. Reports.

And the majority says nothing to the contrary: It does not pretend to have the requisite justifications to overrule *Abood*. Readers of today's decision will know that *Abood* does not rank on the majority's top-ten list of favorite precedents—and that the majority could not restrain itself from saying (and saying and saying) so. Yet they will also know that the majority could not, even after receiving full-

dress briefing and argument, come up with reasons anywhere near sufficient to reverse the decision. Much has gone wrong in today's ruling, but this has not: Save for an unfortunate hiving off of ostensibly "partial-public" employees, *ante*, at 28, *Abood* remains the law.

B

And even apart from *stare decisis*, that result is as it should be; indeed, it is the only outcome that makes sense in the context of our caselaw. In numerous cases decided over many decades, this Court has addressed the government's authority to adopt measures limiting expression in the capacity not of sovereign but of employer. *Abood* fits— fits hand-in-glove—with all those cases, in both reasoning and result. Were that rule not in place, our law respecting public employees' speech rights would contain a serious anomaly—a different legal standard (and not a good one) applying exclusively to union fees.

This Court has long acknowledged that the government has wider constitutional latitude when it is acting as employer than as sovereign. See *Engquist* v. *Oregon Dept. of Agriculture*, 553 U. S. 591, 598 (2008) ("[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate . . . and the government acting . . . to manage [its] internal operation" (internal quotation marks omitted)). "Time and again our cases have recognized that the Government has a much freer hand" in dealing with its employees than with other citizens. *NASA*, 562 U. S., at ___ (slip op., at 12). We have explained that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated" in the public workplace—that the government must have the ability to decide how to manage its employees in order to best provide services to the public. *Engquist*, 553 U. S., at 598. In effect, we have tried to place the government-qua-employer in a similar (though

not identical) position to the private employer, recognizing that both face comparable challenges in maintaining a productive workforce. The result is that a public employee "must accept certain limitations on his or her freedom." *Garcetti* v. *Ceballos*, 547 U. S. 410, 418 (2006). "[A]lthough government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context." *Engquist*, 553 U. S., at 600.

Further, this Court has developed and applied those principles in numerous cases involving First Amendment claims. "Government employers, like private employers," we have explained, "need a significant degree of control over their employees' words" in order to "efficient[ly] provi[de] public services." *Garcetti*, 547 U. S., at 418. Accordingly, we have devised methods for distinguishing between speech restrictions reflecting the kind of concerns private employers often hold (which are constitutional) and those exploiting the employment relationship to restrict employees' speech as private citizens (which are not). Most notably, the Court uses a two-step test originating in *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968). First, if the expression at issue does not relate to "a matter of public concern," the employee "has no First Amendment cause of action." *Garcetti*, 547 U. S., at 418. Second, even if the speech addresses a matter of public concern, a court is to determine whether the government "had an adequate justification" for its action, *ibid.*, by balancing "the interests of the [employee] as a citizen . . . and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U. S., at 568.

*Abood* is of a piece with all those decisions; and indeed, its core analysis mirrors *Pickering*'s. The *Abood* Court recognized that fair-share provisions function as prerequi-

sites to employment, assessed to cover the costs of representing employees in collective bargaining.  Private employers, *Abood* noted, often established such employment conditions, to ensure adequate funding of an exclusive bargaining agent, and thus to promote labor stability. *Abood* acknowledged (contrary to the majority's statement, see *ante*, at 17) certain "differences in the nature of collective bargaining in the public and private sectors."  431 U. S., at 227; see *id.*, at 227–229.  But the Court concluded that the government, acting as employer, should have the same prerogative as a private business in deciding how best to negotiate with its employees over such matters as wages and benefits.  See *id.*, at 229 ("[T]here can be no principled basis for" distinguishing between a public and private employer's view that a fair-share clause will promote "labor stability").  At the same time, the Court recognized the need for some mechanism to ensure that the government could not leverage its power as employer to impinge on speech its employees undertook as citizens on matters of public import.  See *id.,* at 234–236.

    The Court struck the appropriate balance by drawing a line, corresponding to *Pickering*'s, between fees for collective bargaining and those for political activities.  On the one side, *Abood* decided, speech within the employment relationship about pay and working conditions pertains mostly to private concerns and implicates the government's interests as employer; thus, the government could compel fair-share fees for collective bargaining.  On the other side, speech in political campaigns relates to matters of public concern and has no bearing on the government's interest in structuring its workforce; thus, compelled fees for those activities are forbidden.  In that way, the law surrounding fair-share provisions coheres with the law relating to public employees' speech generally.  Or, said otherwise, an anomaly in the government's regulation of its workforce would arise in *Abood*'s absence: Public em-

ployers could then pursue all policies, except this single one, reasonably designed to manage personnel and enhance the effectiveness of their programs.

The majority's critique of *Abood* principally goes astray by deeming all this irrelevant. This Court, the majority insists, has never "seen *Abood* as based on *Pickering* balancing." *Ante*, at 34. But to rely on *Abood*'s failure to cite *Pickering* more often, as the majority does, see *ante*, at 34, n. 26, is to miss the essential point. Although stemming from different historic antecedents, the two decisions addressed variants of the same issue: the extent of the government's power to adopt employment conditions affecting expression. And as just discussed, the two gave strikingly parallel answers, providing a coherent framework to adjudicate the constitutionality of those regulations.

To the extent the majority engages with that framework, its analysis founders at the first step, in assessing the First Amendment value of the speech at issue here. A running motif of the majority opinion is that collective bargaining in the public sector raises significant questions about the level of government spending. *Ante*, at 17–18 and n. 7, 36 and nn. 28–29. By financing the SEIU's collective bargaining over wages and benefits, the majority suggests, in-home caregivers—whether they wish to or not—take one side in a debate about those issues.

But that view of the First Amendment interests at stake blinks decades' worth of this Court's precedent. Our decisions (tracing from *Pickering* as well as *Abood*) teach that internal workplace speech about public employees' wages, benefits, and such—that is, the prosaic stuff of collective bargaining—does not become speech of "public concern" just because those employment terms may have broader consequence. To the contrary, we have made clear that except in narrow circumstances we will not allow an employee to make a "federal constitutional issue" out of basic

"employment matters, including working conditions, pay, discipline, promotions, leave, vacations, and terminations." *Borough of Durye*a v. *Guarnieri*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 10); see *Umbehr*, 518 U. S., at 675 (public employees' "speech on merely private employment matters is unprotected"). Indeed, even *Abood*'s original detractors conceded that an employee's interest in expressing views, within the workplace context, about "narrowly defined economic issues [like] salaries and pension benefits" is "relatively insignificant" and "weak." 431 U. S., at 263, n. 16 (Powell, J., concurring in judgment). (Those Justices saved their fire for teachers' speech relating to education policy. See *ibid.*) And nowhere has the Court ever suggested, as the majority does today, see *ante*, at 35–36 and n. 28, that if a certain dollar amount is at stake (but how much, exactly?), the constitutional treatment of an employee's expression becomes any different.

Consider an analogy, not involving union fees: Suppose an employee violates a government employer's work rules by demanding, at various inopportune times and places, higher wages for both himself and his co-workers (which, of course, will drive up public spending). The government employer disciplines the employee, and he brings a First Amendment claim. Would the Court consider his speech a matter of public concern under *Pickering*? I cannot believe it would, and indeed the petitioners' own counsel joins me in that view. He maintained at oral argument that such speech would concern merely an "internal proprietary matter," thus allowing the employer to take disciplinary action. Tr. of Oral Arg. 6, 10. If the majority thinks otherwise, government entities across the country should prepare themselves for unprecedented limitations on their ability to regulate their workforces. But again, I doubt they need to worry, because this Court has never come close to holding that any matter of public employment affecting public spending (which is to say most such mat-

ters) becomes for that reason alone an issue of public concern. (And on the off-chance that both the petitioners and I are wrong on that score, I am doubly confident that the government would prevail under *Pickering*'s balancing test.)

I can see no reason to treat the expressive interests of workers objecting to payment of union fees, like the petitioners here, as worthy of greater consideration. The subject matter of the speech is the same: wages and benefits for public employees. Or to put the point more fully: In both cases (mine and the real one), the employer is sanctioning employees for choosing either to say or not to say something respecting their terms and conditions of employment. Of course, in my hypothetical, the employer is stopping the employee from speaking, whereas in this or any other case involving union fees, the employer is forcing the employee to support such expression. But I am sure the majority would agree that that difference does not make a difference—in other words, that the "difference between compelled speech and compelled silence" is "without constitutional significance." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 796 (1988). Hence, in analyzing the kind of expression involved in this case, *Abood* corresponds to *Pickering* (and vice versa)— with each permitting a government to regulate such activity in aid of managing its workforce to provide public services.

Perhaps, though, the majority's skepticism about *Abood* comes from a different source: its failure to fully grasp the government's interest in bargaining with an adequately funded exclusive bargaining representative. One of the majority's criticisms of *Abood*, stated still more prominently in *Knox*, 567 U. S., at ___ (slip op., at 10–11), goes something as follows. *Abood* (so the majority says) wrongly saw a government's interest in bargaining with an exclusive representative as "inextricably linked" with a fair-share

agreement. *Ante*, at 31; see *ante*, at 20. A State, the majority (a bit grudgingly) acknowledges, may well have reasons to bargain with a single agent for all employees; and without a fair-share agreement, that union's activities will benefit employees who do not pay dues. Yet "[s]uch free-rider arguments," the majority avers, "are generally insufficient to overcome First Amendment objections." *Ante*, at 8–9 (quoting *Knox*, 567 U. S., at ___ (slip op., at 10–11)). In the majority's words: "A host of organizations advocate on behalf of the interests of persons falling within an occupational group, and many of these groups are quite successful even though they are dependent on voluntary contributions." *Ante*, at 33–34.

But *Abood* and a host of our other opinions have explained and relied on an essential distinction between unions and special-interest organizations generally. See, *e.g.*, *Abood*, 431 U. S., at 221–222 and n. 15; *Communications Workers* v. *Beck*, 487 U. S. 735, 750 (1988); *Machinists* v. *Street*, 367 U. S. 740, 762 (1961). The law compels unions to represent—and represent fairly—every worker in a bargaining unit, regardless whether they join or contribute to the union. That creates a collective action problem of far greater magnitude than in the typical interest group, because the union cannot give any special advantages to its own backers. In such a circumstance, not just those who oppose but those who favor a union have an economic incentive to withhold dues; only altruism or loyalty—as *against* financial self-interest—can explain their support. Hence arises the legal rule countenancing fair-share agreements: It ensures that a union will receive adequate funding, notwithstanding its legally imposed disability—and so that a government wishing to bargain with an exclusive representative will have a viable counterpart.

As is often the case, JUSTICE SCALIA put the point best:

"Where the state imposes upon the union a duty to de-
liver services, it may permit the union to demand re-
imbursement for them; or, looked at from the other
end, where the state creates in the nonmembers a le-
gal entitlement from the union, it may compel them to
pay the cost. The 'compelling state interest' that justi-
fies this constitutional rule is not simply elimination
of the inequity arising from the fact that some union
activity redounds to the benefit of 'free-riding' non-
members; private speech often furthers the interests
of nonspeakers, and that does not alone empower the
state to compel the speech to be paid for. What is dis-
tinctive, however, about the 'free riders' [in unions]
. . . is that . . . the law *requires* the union to carry
[them]—indeed, requires the union to go *out of its way*
to benefit [them], even at the expense of its other in-
terests. . . . [T]he free ridership (if it were left to be
that) would be not incidental but calculated, not im-
posed by circumstances but mandated by government
decree." *Lehnert*, 500 U. S., at 556 (opinion concur-
ring in judgment in part and dissenting in part).

And in other parts of its opinion, the majority itself mim-
ics the point, thus recognizing the core rationale of *Abood*:
What justifies the agency fee, the majority notes, is "the
fact that the State compels the union to promote and
protect the interests of nonmembers." *Ante*, at 25; see
*ante*, at 27, n. 18. Exactly right; indeed, that is as clear a
one-sentence account of *Abood*'s free-rider rationale as
appears in this Court's decisions.

Still, the majority too quickly says, it has no worries in
this case: Given that Illinois's caregivers voted to unionize,
"it may be presumed that a high percentage of [them]
became union members and are willingly paying union
dues." *Ante*, at 33. But in fact nothing of the sort may be
so presumed, given that union supporters (no less than

union detractors) have an economic incentive to free ride. See *supra*, at 22–23. The federal workforce, on which the majority relies, see *ante*, at 31, provides a case in point. There many fewer employees pay dues than have voted for a union to represent them.[7] And why, after all, should that endemic free-riding be surprising? Does the majority think that public employees are immune from basic principles of economics? If not, the majority can have no basis for thinking that absent a fair-share clause, a union can attract sufficient dues to adequately support its functions.

This case in fact offers a prime illustration of how a fair-share agreement may serve important government interests. Recall that Illinois decided that collective bargaining with an exclusive representative of in-home caregivers would enable it to provide improved services through its Rehabilitation Program. See *supra*, at 7–8. The State thought such bargaining would enable it to attract a better and more stable workforce to serve disabled patients, preventing their institutionalization and thereby decreasing total state expenditures. The majority does not deny the State's legitimate interest in choosing to negotiate with an exclusive bargaining agent, in service of administering an effective program. See *ante*, at 32–33. But the majority does deny Illinois the means it reasonably deemed appropriate to effectuate that policy—a fair-share provision ensuring that the union has the funds necessary to carry out its responsibilities on behalf of in-home care-

---

[7] See, *e.g.*, R. Kearney & P. Mareschal, Labor Relations in the Public Sector 26 (5th ed. 2014) ("[T]he largest federal union, the American Federation of Government Employees (AFGE), represented approximately 650,000 bargaining unit members in 2012, but less than half of them were dues-paying members. All told, out of the approximately 1.9 million full-time federal wage system (blue-collar) and General Schedule (white-collar) employees who are represented by a collective bargaining contract, only one-third actually belong to the union and pay dues").

givers. The majority does so against the weight of all precedent, and based on "empirical assumption[s]," *ante*, at 20, lacking any foundation. *Abood* got this matter right; the majority gets it wrong: Illinois has a more than sufficient interest, in managing its workforce and administering the Rehabilitation Program, to require employees to pay a fair share of a union's costs of collective bargaining.

## III

For many decades, Americans have debated the pros and cons of right-to-work laws and fair-share requirements. All across the country and continuing to the present day, citizens have engaged in passionate argument about the issue and have made disparate policy choices. The petitioners in this case asked this Court to end that discussion for the entire public sector, by overruling *Abood* and thus imposing a right-to-work regime for all government employees. The good news out of this case is clear: The majority declined that radical request. The Court did not, as the petitioners wanted, deprive every state and local government, in the management of their employees and programs, of the tool that many have thought necessary and appropriate to make collective bargaining work.

The bad news is just as simple: The majority robbed Illinois of that choice in administering its in-home care program. For some 40 years, *Abood* has struck a stable balance—consistent with this Court's general framework for assessing public employees' First Amendment claims— between those employees' rights and government entities' interests in managing their workforces. The majority today misapplies *Abood*, which properly should control this case. Nothing separates, for purposes of that decision, Illinois's personal assistants from any other public employees. The balance *Abood* struck thus should have defeated the petitioners' demand to invalidate Illinois's fair-share agreement. I respectfully dissent.