

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE MAY 0 4 2017

~Tainhurst, CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on May 4, 2017

E. ___

for SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MIRANDA THORPE, an Individual Provider of Washington, | ) ) ) | No. 92912-2 |
| Appellant, | ) ) | |
| v. | ) ) | En Banc |
| GOVERNOR JAY INSLEE, in his official capacity as Governor of the State of Washington; WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES ("DSHS"), SERVICE EMPLOYEES INTERNATIONAL UNION HEALTHCARE 775NW ("SEIU 775"), a labor organization, | ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) ) | Filed    MAY 0 4 2017 |

JOHNSON, J.—This case presents the question of whether the current collective bargaining agreement (CBA) between the State of Washington and Services Employees International Union Healthcare 775NW (SEIU) includes a union security provision statutorily authorized under chapter 41.56 RCW. The trial court held that the CBA contains an authorized union security provision and dismissed the lawsuit. We affirm.

FACTS AND PROCEDURAL HISTORY

Miranda Thorpe is an individual provider (IP) of home care services to her daughter, a Medicaid beneficiary. IPs contract with the Department of Social and Health Services (DSHS) to provide personal care, respite care, and other social services, and are paid by the State. IPs are public employees "[s]olely for the purposes of collective bargaining." RCW 74.39A.270(1). SEIU is the exclusive bargaining representative of all IPs in Washington. Pursuant to the current CBA negotiated by SEIU, the State deducts union dues, or an equivalent fee, from payment to providers. Before 2014, the CBA contained an agency shop[1] provision that mandated that all providers either pay dues or equivalent fees, with no opt out provision. After the United States Supreme Court held that the First Amendment prohibited mandatory collection of fees from Illinois IPs of Medicaid services who did not wish to financially support a union,[2] SEIU and the State entered into the current agreement.

---

[1] An agency shop requires bargaining unit members "to pay dues or service charges to the collective bargaining agent. Nonunion employees, however, are not required to join the union as a condition of employment." ROBERTS' DICTIONARY OF INDUSTRIAL RELATIONS 14 (rev. ed. 1971).

[2] *Harris v. Quinn*, ___ U.S. ___134 S. Ct. 2618, 189 L. Ed. 2d 620 (2014).

The current agreement, which took effect on July 1, 2015, allows any provider who chooses to not join or financially support the union to opt out. Anyone who does not opt out is treated as a union member in good standing. On May 27, 2015, upon notice of Thorpe's hire by the State, SEIU sent her a notice of her right to not join or financially support the union along with information on what needed to be done. Thorpe did not respond, and the State deducted dues from her paychecks until October 2015, when she filed this suit,[3] seeking an injunction against deductions, damages for dues paid, and costs and attorney fees. She asserts that withholding union dues without express written authorization violates RCW 41.56.113 because the new CBA of 2014 no longer contains a union security provision.

In November 2015, Thorpe filed a motion for summary judgment. The hearing was scheduled for February 26, 2016. In January 2016, respondent SEIU filed a cross motion for summary judgment. In February 2016, respondent State filed a separate cross motion. After oral argument, the trial court granted

---

[3] Thorpe filed the lawsuit against Jay Inslee, in his official capacity as governor of the state of Washington, DSHS, and SEIU. Two response briefs were filed: one by Governor Inslee and DSHS and the other by SEIU. Governor Inslee and DSHS are referred to as the "State."

3

respondents' cross motions and dismissed the suit. Thorpe appealed the trial court's order and requested direct review, which we granted.[4]

ANALYSIS

Chapter 41.56 RCW governs public employees' collective bargaining. Specifically, RCW 41.56.113(1) governs IP collective bargaining when IPs receive their pay directly from the State. The certification or recognition of an exclusive IP bargaining representative triggers the application of RCW 41.56.113(1)(a). RCW 41.56.113(1)(a) provides in pertinent part:

> Upon the written authorization of an individual provider, . . . within the bargaining unit and after the certification or recognition of the bargaining unit's exclusive bargaining representative, the state as payor, but not as the employer, shall, . . . deduct from the payments to an individual provider, . . . the monthly amount of dues as certified by the secretary of the exclusive bargaining representative and shall transmit the same to the treasurer of the exclusive bargaining representative.

This subsection authorizes the State to make payroll deductions for membership dues but requires written authorization to do so.

However, RCW 41.56.113(1)(b) establishes an exception to this requirement. RCW 41.56.113(1)(b)(i) states:

---

[4] There is a related question of whether the current CBA's opt out clause complies with *Harris* or whether *Harris* applies to the Washington IP system. Thorpe's complaint is limited to challenging the statutory definition of union security provision, and she does not raise a constitutional challenge to the opt out system.

(b) If the governor and the exclusive bargaining representative of a bargaining unit of individual providers, family child care providers, adult family home providers, or language access providers enter into a collective bargaining agreement that:

(i) Includes a union security provision authorized in RCW 41.56.122, the state as payor, but not as the employer, shall, subject to (c) of this subsection, enforce the agreement by deducting from the payments to bargaining unit members the dues required for membership in the exclusive bargaining representative, or, for nonmembers thereof, a fee equivalent to the dues.

RCW 41.56.122, provides in pertinent part:

A collective bargaining agreement may:

(1) Contain union security provisions: PROVIDED, That nothing in this section shall authorize a closed shop provision: PROVIDED FURTHER, That agreements involving union security provisions must safeguard the right of nonassociation of public employees based on bona fide religious tenets or teachings of a church or religious body of which such public employee is a member. Such public employee shall pay an amount of money equivalent to regular union dues and initiation fee to a nonreligious charity or to another charitable organization mutually agreed upon by the public employee affected and the bargaining representative to which such public employee would otherwise pay the dues and initiation fee.

Under section .122, union security provisions in CBAs are allowed as long as they are not a closed shop provision[5] and that any provision safeguards the rights of religious objectors.

---

[5] A "closed shop" requires all employees to be union members at the time of his or her initial employment. Such a requirement "closes the shop" to all nonunion employees.

The trial court held that the CBA contains a "form of maintenance-of-membership combination of agency shop" union security provision. Verbatim Report of Proceedings (VRP) at 40. The trial court interpreted RCW 41.56.122 "as the source of a union security provision that is authorized." VRP at 38. It further held that the language in the CBA is not inconsistent with RCW 41.56.113. It rejected Thorpe's argument that RCW 41.56.113(1)(b)(i) operates only where the CBA contains an agency shop arrangement. The court relied on Public Employment Relations Commission (PERC) cases to conclude that the maintenance of membership combination of agency shop here was acceptable. It held that while some combinations are more protective and some are less protective of the union, the provision here encourages membership and predictability, which supports the traditional goals of a union security provision.

An appellate court reviews summary judgment rulings de novo. *Keck v. Collins,* 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). An order granting summary judgment is appropriate where there is "'no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Elcon Constr., Inc. v. E. Wash. Univ.,* 174 Wn.2d 157, 164, 273 P.3d 965 (quoting CR 56(c)). This case presents an issue of statutory interpretation, and no facts are disputed.

"In interpreting a statute, our primary objective is to ascertain and give effect to the intent of the legislature." *Cornu-Labat v. Hosp. Dist. No. 2*, 177 Wn.2d 221, 231, 298 P.3d 741 (2013) (citing *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002)). To determine legislative intent, we begin with the statute's plain language and ordinary meaning. In determining plain meaning, the court may look to all the legislature has said in the statute and related statutes that disclose legislative intent. *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003).

Thorpe asserts that the new CBA does not contain a union security provision authorized in RCW 41.56.113(1)(b)(i) and therefore, the State must acquire written authorization before deducting dues from payments. Under RCW 41.56.113(1)(b)(i), the first criteria for a qualifying union security provision is that it must be authorized in RCW 41.56.122. Thorpe argues that the language of RCW 41.56.122 requires a union security provision that imposes a mandatory financial obligation of every bargaining unit member, i.e., an agency shop provision. We disagree. RCW 41.56.122 is not as narrow as Thorpe claims.

While chapter 41.56 RCW does not define "union security provision," the meaning of that phrase has been addressed in other proceedings. PERC has recognized that the legislature intended the term "union security provision" in RCW 41.56.122 to have the same meaning as that term has been given in the

7

decisions of the National Labor Relations Board (NLRB) interpreting the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169. *City of Seattle*, No. 3169-A, 1990 WL 693213 (Wash. Pub. Emp't Relations Comm'n Mar. 27, 1990). Generally, an agency's definition of an undefined term is given great weight where that agency has the duty to administer the statute. *Phillips v. City of Seattle*, 111 Wn.2d 903, 908, 766 P.2d 1099 (1989). Here, PERC has the duty to administer chapter 41.56 RCW. *Piel v. City of Federal Way*, 177 Wn.2d 604, 633, 306 P.3d 879 (2013) (J.M. Johnson, J., dissenting) (citing RCW 41.56.160). PERC's interpretation of collective bargaining statutes is "entitled to substantial weight and great deference." *City of Bellevue v. Int'l Ass'n of Fire Fighters*, 119 Wn.2d 373, 382, 831 P.2d 738 (1992).

In 1973, when the legislature enacted RCW 41.56.122, the term "union security provision" had a well-established meaning under federal labor law. *City of Seattle*, 1990 WL 693213, at *6. In *City of Seattle*, PERC noted that the definition of "union security" set forth in *Roberts' Dictionary of Industrial Relations* captured the meaning of the term as used in RCW 41.56.122(1). That dictionary defines "union security clauses" as "[p]rovisions in collective bargaining agreements which aim to protect the union against employers, non-union employees, and/or raids by competing unions." ROBERTS' DICTIONARY OF

INDUSTRIAL RELATIONS 555 (rev ed. 1971). In other words, union security is

"'designed to bolster the membership and finances of a union.'" Resp. Br. at 7

(quoting ROBERT A. GORMAN & MATTHEW W. FINKIN, BASIC TEXT ON LABOR

LAW, UNIONIZATION, AND COLLECTIVE BARGAINING 900 (2d ed. 2004)). In

*Roberts' Dictionary*, "closed shop,"[6] "union shop,"[7] "agency shop,"[8] and

"maintenance of membership"[9] clauses are all considered union security

provisions.

Relevant to this case, federal labor law has long recognized maintenance of

membership clauses as common union security provisions. *E.g.*, *Horwath v. Nat'l*

---

[6] A closed shop requires membership in the union as a condition of employment. The employer "is required to hire only employees who are members of the union. . . . The closed shop is illegal under federal labor statutes." ROBERTS', *supra*, at 72.

[7] A union shop allows the employer to "hire whomever he [or she] pleases but requires all new employees to become members of the union within a specified period of time." ROBERTS', *supra*, at 556. It also "requires the individual to remain a member or pay union dues for duration of the collective bargaining agreement." ROBERTS', *supra*, at 556.

[8] Defined *supra* note 1.

[9] A maintenance of membership "require[s] all employees who are union members at the time the contract is executed or at a specified time thereafter, and all employees who later become members, to retain membership as a condition of employment. Nonmembers have no duty to join. The 'membership' requirement is satisfied so long as the employee continues to pay dues. . . .
"Maintenance-of-membership compulsion may run for the duration of the agreement. . . . However, where a contractual 'escape period' is provided, members who resign according to the specified procedures are no longer subject to the agreement." 2 THE DEVELOPING LABOR LAW: THE BOARD, THE COURTS, AND THE NATIONAL LABOR RELATIONS ACT 2260-61 (John E. Higgins, Jr. et al. eds., 6th ed. 2012) (footnotes omitted).

*Labor Relations Bd.*, 539 F.2d 1093, 1098-99 (7th Cir. 1976); *Standard Oil Co. of Cal., W. Operations, Inc. v. Nat'l Labor Relations Bd.*, 399 F.2d 639 (9th Cir. 1968); *Perkins Mach. Co.*, No 1-CA-3894, 141 N.L.R.B. 697 (1963); *Int'l Ass'n of Machinists, AFL-CIO v. Nat'l Labor Relations Bd.*, 247 F.2d 414 (2d Cir. 1957); *Standard Lime & Stone Co.*, No. 8-RC-1231, 95 N.L.R.B. 628 (1951); *Westinghouse Elec. Corp.*, No. 8-C-2174, 80 N.L.R.B. 945 (1948); *Gen. Elec. X-Ray Corp.*, No. 13-C-2902, 76 N.L.R.B. 64 (1948).

In addition, PERC has repeatedly recognized that a maintenance of membership clause is a union security provision authorized in RCW 41.56.122. *Kephart v. Pierce County,* No. 1840-A, 1985 WL 635617 (Wash. Pub. Emp't Relations Comm'n May 14, 1985*); City of Seattle*, 1990 WL 693213; *Wash. State Council of County & City Emps. Council 2 AFSCME, AFL-CIO v. Northshore Util. Dist.,* No. 10534, 2009 WL 3111376 (Wash. Pub. Emp't Relations Comm'n Sept. 10, 2009); *see also* PUB. EMP'T RELATIONS COMM'N, PRACTITIONER GUIDE 29 (Dec. 2007)[10] (permissible union security provisions include the union shop, the agency shop, and maintenance of membership).

---

[10] Available at http://www.perc.wa.gov/quicklinks/Practitioner-Guide.pdf, [https://perma.cc/HGQ7-3ZNB].

Thorpe argues that the religious objector protection would be unnecessary where there is no mandatory financial obligation on every bargaining unit member. However, the NLRB's and PERC's broad interpretation of "union security provision" is consistent with the wording of RCW 41.56.122, which prohibits closed shop union security clauses but permits public employers and unions to negotiate union shop, agency shop, and maintenance of membership union security provisions as long as the clause recognizes the rights of religious beliefs. If a CBA excuses religious objectors from a financial obligation entirely, the CBA has satisfied the religious objector protection requirement of RCW 41.56.122. The religious objector protection does not require that a CBA impose a mandatory financial obligation on every bargaining unit member. As established by NLRB and PERC rulings, union security provisions can be crafted within a range of options, some broader, some narrower, so the wording of the statute is not as narrow or restrictive as Thorpe asserts.

Next, Thorpe argues that even if RCW 41.56.122 authorizes a broad variety of union security provisions, RCW 41.56.113(1)(b)(i) establishes a limitation on the types of union security provisions that override the prior written authorization requirement. Thorpe argues that RCW 41.56.113(1)(b)(i) authorizes only one type of provision that overrides the prior written authorization requirement: agency

shop provisions. She highlights section .113's requirement that the "state . . . shall . . . enforce the agreement by deducting from the payments to bargaining unit members the dues required for membership." RCW 41.56.113(1)(b)(i). Thorpe argues that there must be a mandatory fee on every IP in the bargaining unit, otherwise the State cannot enforce an agreement that deducts payments from bargaining unit members. We disagree. RCW 41.56.113(1)(b)(i) states that the employer "shall . . . enforce the *agreement.*" (Emphasis added.) The State's statutory obligation to deduct dues or fees applies only to bargaining unit members on whom the CBA imposes financial obligations related to union memberships. Here, the CBA does not require dues for union membership; therefore, the State has no obligation to impose deductions from payments.

The next question is whether the CBA here contains an authorized union security provision. Here, the trial court correctly held that the CBA contains a maintenance of membership combination of agency shop union security provision authorized under RCW 41.56.113(1)(b)(i). The legislature's use of the plural "union security provisions" in RCW 41.56.122 "contemplates parties bargaining about the various types of union security clauses to determine one that both parties find is agreeable." *Kephart*, 1985 WL 635617, at *8. Parties may combine certain elements of one type of union security provision with elements of another type to

tailor to the particular needs of their collective bargaining relationship. For example, in *Kephart*, PERC held that a CBA provision that combined elements of "maintenance of membership" and "union shop" provisions was a union security provision authorized by RCW 41.56.122. PERC explained:

> The union and the employer had the right under RCW 41.56.122 to bargain the inclusion of a form of union security into the contract.
>
> Nor is the article subject to attack on the basis that it does not call for full union security. The contract imposes a "maintenance of membership" obligation coupled with "union shop" obligation on new hires, but appears to impose no obligation on employees who were not members on the contract's effective date, and so might be described as a "modified union shop" clause.

*Kephart*, 1985 WL 635617, at *8; *see also Northshore Util. Dist.*, 2009 WL 3111376.

> Here, article 4.1.A of the current CBA provides:
>
> In accordance with RCW 41.56.113(1)(b)(i), the State as payor, but not as the employer, shall cause the appropriate entity or agency to deduct the amount of dues or, for non-members of the Union, a fee equivalent to the dues from each home care worker's payment for services (paycheck or direct deposit).

Clerk's Papers (CP) at 95.

Article 4.1.B provides, in summary, that any IP who does not wish to join or financially support the union may opt out of union membership, and the obligation to pay union dues, by notifying the union within 30 days of being informed of the

13

right to opt out. If an IP chooses not to opt out, he or she will be assessed monthly union dues until such time as he or she opts out.[11] An IP who has not opted out of paying dues is treated as a member in good standing of SEIU regardless of whether he or she signs a membership card.

Article 4.1.C of the CBA provides that an IP who chooses to sign an SEIU membership card must pay all assessed union dues and fees unless and until the card is validly revoked. Article 4.1.C further states, "The Employer shall honor the terms and conditions of each home care worker's signed membership card." SEIU's membership card provides in pertinent part:

> I hereby request and accept membership in SEIU 775. I authorize 775 to act as my exclusive representative in collective bargaining over wages, hours and other terms and conditions of employment with my employer(s). I authorize my employer(s) to deduct from my wages all Union dues and other fees or assessments as shall be certified by 775 under its Constitution and Bylaws and to remit those amounts to 775. This authorization is irrevocable for a period of one year from the date of execution and from year to year thereafter unless not less than thirty (30) and not more than forty-five (45) days prior to the annual

---

[11] Article 4.1.B states in full:

"The union shall notify each home care worker covered by this Agreement that he or she is not required to join or financially support the Union. New home care workers will be notified as soon as possible, but no later than fourteen (14) days from the Union receiving the home care worker's contact information. The Union shall escrow the fee paid by a new home care worker in an interest-bearing account. The fee shall remain in this account until the home care worker is notified of the opportunity to opt-out and given thirty (30) calendar days to do so. If the home care worker objects to paying the fee within thirty (30) days of the notification from the Union, the Union shall, within twenty (20) days of receiving the notice from the home care worker, refund the fee with interest (at the rate of interest it has received). The Union will notify the Employer to cease further deductions in accordance with the Subsection 4.1C below." CP at 95.

anniversary date of this authorization or the termination of the contract between my employer and the Union, whichever occurs first, I notify the Union and my employer in writing, with my valid signature, of my desire to revoke this authorization.

CP at 382.

Article 4.1.C thus requires every IP who has signed this membership card to contribute to the union via a payroll deduction for the duration of the CBA, unless he or she revokes this dues authorization within the annual 15-day "escape period" specified on the card.

Here, the CBA is very similar to the maintenance of membership union security provision the NLRB upheld in *Standard Lime*. The language in the *Standard Lime* CBA stated:

> All employees in the eligible unit at the plant shall have the right to belong to or not to belong to the Union, and upon receipt of written authorization from any employee who is a member of the Union *the Company agrees that such employee shall maintain his membership in the Union* for a period not to exceed one (1) year from the date of the written authorization, or the length of this contract if terminated prior to one (1) year after the date of said authorization, and the payment of dues shall satisfy this requirement.

*Standard Lime*, 95 N.L.R.B. at 629. The relevant union membership card stated, "This authorization is to remain in full force and effect for a period of [sic] not to exceed one (1) year from its date or the length of the existing agreement, whichever is shorter." *Standard Lime*, 95 N.L.R.B. at 629. The employer in

15

*Standard Lime* argued that the contractual language at issue was not a maintenance of membership union security provision because it allowed employees to cancel the authorization for dues deduction at any time. The NLRB rejected the employer's arguments. The board held that the CBA language was a union security provision, reasoning that "[t]he fact that the provision does not state that maintenance of membership thereafter shall be a condition of employment does not prevent the provision from operating as a union-security clause." *Standard Lime*, 95 N.L.R.B. at 630.

Our analysis is consistent with federal labor law interpretation, and Thorpe cites no cases or decisions supporting a more restrictive or different rule. Like the CBA in *Standard Lime*, article 4.1.C requires members of SEIU to maintain their membership for at least one year, or in perpetuity if they do not opt out. Simply because the maintenance of membership is not a condition of employment does not restrict the provision from operating as a union security clause. Full security is not required.

We agree with the trial court's reasoning that the purposes of union security provisions are to encourage membership and predictability. VRP (Feb. 26, 2016) at 40. The CBA provision here promotes those purposes with its default scheme wherein members pay dues but have no duty to join. We hold that the CBA

contains a union security provision authorized in chapter 41.56 RCW. We affirm.

_____

WE CONCUR:

Fairhurst, C.J.

Madsen, J.

Owens, J.

Stephens, J.

Wiggins, J.

González, J.

Gordon McCloud, J.

Yu, J.